LLOYD F. PRICKETT v. VIRGLE L. FARRELL, ADMINISTRATOR ET AL

5-5261                                    455 S. W. 2d 74

Opinion delivered June 15, 1970

*House, Holmes & Jewell* and *Barber, Henry, Thurman, McCaskill & Amsler,* for appellant.

*Hall, Tucker & Lovell* and *McMath, Leatherman & Woods,* for appellees.

JOHN A. FOGLEMAN, Justice. Appellees are the personal representatives of the driver and three passengers of a Plymouth automobile who died as the result of a mishap which occurred on Interstate Highway 30 in Saline County at about 11:45 p.m. on June 4, 1968. They brought wrongful death actions against appellant Lloyd F. Prickett, Prickett Dairy, Inc., E. W. Prickett, Texas Tool Traders and Eulogio B. Gonzales, Jr. Trial of the consolidated actions resulted in a judgment for appellees against Lloyd F. Prickett only, and he brings the direct appeal. As his only point for reversal, he contends that the uncontradicted evidence shows that he was guilty of no negligence which was a proximate cause of the deaths. We do not agree.

There seems little doubt that the chain of events resulting in the unfortunate deaths of four young people originated because of the presence of a brown and white spotted horse, or pony, in the lanes provided for

southbound traffic on this divided, controlled-access highway. The vehicle in which appellees' decedents were riding was being driven by Bradley Maxey in a southerly direction on the highway in the lanes provided for vehicles traveling in that direction. The circumstances clearly indicate that this horse or pony was struck by this Plymouth automobile and that the automobile then careened at an angle across the median, entered the northbound traffic lanes on the opposite side and collided with a tractor-trailer owned by Texas Tool Traders and driven by Gonzales. The issues as to liability of appellant and E. W. Prickett were limited by a pretrial order, entered without objection, to the sole question whether they were guilty of negligence for violation of Ark. Stat. Ann. § 41-430 (Repl. 1964).[1] The gist of appellant's argument is that there was no substantial evidence that he was the owner of the horse or that he was guilty of any negligence in allowing it to be on the highway.

One Roy Bishop testified that he sold the pony in question to Beecher Bullock, Lloyd Prickett's father-in-law, who purchased it for the use of Prickett's son, David. Lloyd Prickett testified that Bullock had given the pony to David about two years before this occurrence, when the lad was nine years of age. Appellant admitted that the gift was accepted both by him and his son. From this time until two weeks before the collision, the pony was kept in a pasture around Lloyd Prickett's house. According to appellant, David looked after the pony for the most part, but both father and son fed and cared for it. Feed for the pony was bought by Lloyd Prickett and Bullock but not by David. Lloyd Prickett paid to have the horse shod. Appellant knew that this pony and another had escaped from the Lloyd Prickett pasture at least three times over a period of one year. The third time was on a Sunday about two weeks before the incident resulting in these deaths. When appellant returned to his home that Sunday after-

---

[1]This statute reads: "After the passage of this Act it shall be unlawful for owners of cattle, horses, mules, hogs, sheep, or goats to allow them to run at large along or on any public highway in the State of Arkansas."

noon, he saw boards off the pasture fence and immediately called his father, E. W. Prickett, to ascertain whether these ponies had escaped from the pasture. E. W. Prickett replied that they had gotten out and crossed the "freeway" and that he had put them in his own five-acre pasture on the opposite side of the highway from Lloyd's pasture. Thereafter, the ponies were kept in E. W. Prickett's pasture, but Lloyd Prickett never made any physical inspection of the fences or condition of the wire around this pasture bordering the busy highway.

In answer to inquiries on cross-examination as to the extent of his control over the animal, Lloyd Prickett stated that he felt sure that he could do anything he felt like he wanted to, like selling it, and get away with it. E. W. Prickett called his son Lloyd when he found the ponies were out. Lloyd Prickett was first notified of the tragic disaster, from which the deaths of these victims arose, by his brother-in-law, who heard the collision, went to the scene and called appellant.

We agree with appellant that only the "owner" of livestock at large upon a public highway may be held liable for damages resulting. Even though Ark. Stat. Ann. § 41-430 (Repl. 1964) is a penal statute to be strictly construed in favor of one against whom it is asserted, the word "owner" therein does not have the very narrow meaning appellant would have us give it. We have previously held that even in a statute of this nature the word "owner" should not be construed in a technical sense, but in a popular one. See *Bush* v. *State*, 128 Ark. 448, 194 S. W. 857.[2] There we relied upon and quoted from a Pennsylvania case in which the statute involved required owners of certain buildings to provide fire escapes. Yet, in a suit against a tenant,

---

[2]For other cases in which we have held that the word "owner" in a penal statute has a meaning broader than its most restricted technical sense, see *Hood* v. *State*, 206 Ark. 900, 175 S. W. 2d 205; *Arnett* v. *State*, 188 Ark. 1106, 70 S. W. 2d 38; *Chicago, R. I. & P. Ry. Co.* v. *State*, 84 Ark. 409, 106 S. W. 199.

who leased a building, for damages resulting from the failure to provide a fire escape, it was held that the tenant was an "owner" in the sense of the statute. We applied that precedent in holding that a receiver of a railroad corporation, or anyone operating it came within the purview of the words "the corporation owning a railroad" in a penal statute requiring the giving of signals by trains approaching crossings. In arriving at this conclusion, we were greatly influenced by the obvious design of the legislature in enacting that law to protect travelers against accidents that might occur at railroad crossings were the signals not given. In this case, the obvious design of the General Assembly was to afford a similar measure of protection to travelers upon our highways.

We have also said that the word "owner" in an act subjecting an "owner" to civil and penal consequences for intentionally or negligently permitting his animals to run at large, includes one who has the right of immediate possession and control, and to exclude the one holding absolute title but not having such rights at the critical time. *Fraser* v. *Hawkins,* 137 Ark. 214, 208 S. W. 296. We once recognized that circumstances might exist under which a parent might exercise a certain degree of control over a slave given his child. *Dodd* v. *McGraw,* 8 Ark. 83, 46 Am. Dec. 301. Certainly we should not say as a matter of law that a parent may not, under any circumstances, have any control over an animal given his minor child.

When we consider the legislative purpose in enacting the statute in question here, we think it clear that the word "owner" therein was intended to encompass a father who actually had the right of control of an animal given to his minor son. Even though we doubt appellant's legal authority to sell his son's pony without court authorization, we find the evidence stated above sufficient to pose to the jury the question whether appellant was an owner of the pony in the sense that he had a right of dominion and control over it.

Appellant also argues that, even though this pony was on the highway outside the enclosure in which he was kept, there was no evidence of negligence on his part. Of course, violation of the statute is itself evidence of negligence to be considered along with other facts and circumstances. *Rogers* v. *Stillman,* 223 Ark. 779, 268 S. W. 2d 614. It then becomes necessary to determine whether there was substantial evidence that appellant allowed the pony to run at large on the highway. We find such evidence.

Appellant knew that this pony and another kept with him had escaped three times. On at least one of these occasions it seemed to him that the animals had kicked boards off the fence enclosing the pasture where they were then kept. After these ponies were taken up by E. W. Prickett, appellant made no effort to determine whether the fences and gates enclosing the pasture where they were kept thereafter were adequate to confine them. Trooper Ronnie Burk, who arrived at the scene soon after the occurrence, investigated the enclosures. Looking along the fence of the pasture where the Prickett boy's pony was kept, he saw fresh manure at a point where the fence line crossed a creek. He also found fresh hoof marks both inside and outside the fence near the creek and fence. The bottom strand of this barbed wire fence struck the officer at a height two inches below his belt. If he had stepped into the creek to make his measurement the wire would have struck a higher point on his body. He described the wire as being extremely loose and without supporting posts for quite a distance at the creek. He found the first post west of the creek either broken off or rotted off at the ground, so that it did not keep the wire taut even though the wire was nailed to it. He described the whole fence line as having been in poor condition, with posts rotted off at the ground and the barbed wire extremely loose. He said that two or three strands of the wire were not even nailed to the post at one point.

Trooper Frank Mitchell, who arrived later and

assisted in the investigation, found the pasture fence in a bad state of repair in the area near the creek. He found the wire loose and a strand broken at the creek. He described the post near the creek as broken or rotted off at the ground so that it was hanging on the wire. He estimated the height of the lowest wire on this post as "waist high" and said that the wire was higher off the ground than the pony would have been if it were standing.

The word "allow" in the sense it is used in this statute means "to permit by neglecting to restrain or prevent." Webster's Third New International Dictionary. The evidence was sufficient to support a finding by the jury that the Prickett pony escaped from the pasture because appellant was negligent in failing to observe that the fence was in a bad state of repair and to take reasonable precautions to prevent the escape. See *Lavender* v. *Southern Farmers' Association,* 246 Ark. 762, 440 S. W. 2d 241.

Appellant also argues that we should reverse the judgment against him because the jury found that the fence was in good condition, that the horses did not escape because of any defect therein and that E. W. Prickett was not guilty of any negligence, by its verdict in his favor. Of course, this is not a case where the liability of either E. W. Prickett or Lloyd F. Prickett is dependent upon the liability of the other. Inconsistent verdicts are not grounds for reversal in a case like this. An alleged joint tortfeasor held liable cannot complain because the verdict was not against all the wrongdoers. *Fireman's Insurance Co.* v. *Jones,* 245 Ark. 179, 431 S. W. 2d 728; *Patterson* v. *Risher,* 143 Ark. 376, 221 S. W. 468; *Roach* v. *Rector,* 93 Ark. 521, 123 S. W. 399; *Harris* v. *Preston,* 10 Ark. 201. Actually, the jury was instructed, without objection, that each defendant's case would be decided as if it were a separate lawsuit. Furthermore, the jury may well have found that E. W. Prickett did not have such custody and control of the animal as to constitute him to be an owner in the sense of § 41-430, if in fact there was

sufficient evidence to raise a jury question in this regard. So far as this record discloses, he did nothing except take up the ponies when he found them out, advise appellant, and subsequently allow the ponies to be kept in his pasture as an accommodation.

As a matter of fact, appellees on cross-appeal argue for reversal of the judgment in favor of E. W. Prickett on the sole ground that the court should have given their requested instruction which would have permitted recovery against both Pricketts on the basis of res ipsa loquitur. We have never applied that doctrine under the statute in a case such as this. Actually, we have held that the presence upon the highway of animals which had escaped from a pasture in the nighttime did not even constitute prima facie evidence of negligence. *Favre* v. *Medlock*, 212 Ark. 911, 208 S. W. 2d 439. Their argument, based upon one decision in a foreign jurisdiction,[3] that we should adopt the "modern trend" and make the doctrine applicable here, is not found persuasive. It is sufficient, however, to say that the complaints were not based upon application of res ipsa loquitur, and that the pretrial order limited the issue to determination whether there was negligence in violation of Ark. Stat. Ann. § 41-430, without any objection on the part of appellees. It is clear from the record that the theory of res ipsa loquitur was first suggested when appellees' requested instruction No. 21 was offered. Furthermore, the doctrine could not have applied to E. W. Prickett, because the evidence clearly shows that he never exercised the requisite exclusive control over the animal. See *Bullington* v. *Farmer's Tractor & Implement Co.*, 230 Ark. 783, 324 S. W. 2d 517.

Appellees also contend that the court erred in directing a verdict in favor of Eulogio B. Gonzales, Jr., and Texas Tool Traders. Even giving the evidence its strongest probative force in favor of appellees, we

[3]*Mercer* v. *Bryons*, 200 F. 2d 284 (1st Cir. 1952). Other jurisdictions have refused to apply the doctrine, *e. g.*, see *Wilson* v. *Rule*, 169 Kan. 296, 219 P. 2d 690 (1950); *Abbott* v. *Howard*, 169 Kan. 305, 219 P. 2d 696 (1950); *Gardner* v. *Black*, 217 N. C. 573, 9 S. E. 2d 10 (1940); *Rice* v. *Turner*, 191 Va. 601, 62 S. E. 2d 24 (1950).

find no error in this respect. Gonzales was driving the Texas Tool Traders tractor-trailer in his proper lane in a lawful manner. He was proceeding northwardly on the inside lane of a 24-foot concrete slab separated by a 40-foot median from the southbound lanes on which the Maxey Plymouth was proceeding. The total distance between the concrete slabs was 61' 6". After the Plymouth struck the pony, it traveled 253 feet at an angle across the median into the path of the truck driven by Gonzales in the northbound traffic lanes.

According to Gonzales, he saw a white object in the southbound lanes and a sudden flash. Immediately the white object came across the median toward his projected path of travel at a high rate of speed. When he became aware that this object, which he then realized was an automobile, was coming into his line of travel, he swerved his vehicle sharply to his right and reached for his brakes. The brakes on the truck had not taken effect at the moment of the impact. Gonzales said that only a split second elapsed between the time he saw that the Maxey vehicle was headed toward him and the collision. The object approaching him had no headlights, and it appeared to him that lights on the object disappeared when he saw the flash. The major impact of the collision was on the right front of his tractor, but both front wheels were damaged. The police officer testified that the left front wheel was damaged by efforts to stop the truck. Apparently the full impact of the collision was on the driver's right-hand side of the Plymouth. Gonzales testified that the impact destroyed the braking system on the truck. Certainly, it cannot be said that a driver traveling in a proper lane in a lawful manner on a divided highway should constantly maintain a lookout for vehicles suddenly projected across a 40-foot median into his path of travel. He had a right to assume that vehicles proceeding in the opposite direction would not cross into his lane of travel. We cannot say that there is any evidence that Gonzales did anything he should not have done or failed to do anything he should have done or that any act or omission on his part con-

tributed to the cause of this tragic collision. In the absence of proof of facts, or evidence from which reasonable inferences might be drawn, to establish substantial evidence that Gonzales was guilty of any negligence which was the proximate cause of the collision causing the deaths of appellees' decedents, a verdict was properly directed. *Steinberg* v. *Ray*, 236 Ark. 569, 367 S. W. 2d 445.

The judgment is affirmed in all respects.