476 A.2d 227

**Roy A. SLACK, et ux.**

v.

**Dorothy VILLARI, et vir.**

**No. 1771, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

June 11, 1984.

John A. Buchanan, Upper Marlboro, with whom were Una M. Perez and Sasscer, Clagett, Channing & Bucher, Upper Marlboro, on the brief, for appellants.

Patrick R. Duley, Upper Marlboro, with whom were Kevin C. Gale and Haskell & Duley, Upper Marlboro, on the brief, for appellees.

Argued before LISS, WEANT and ALPERT, JJ.

WEANT, Judge.

"When a dog runs at you, whistle for him." So advised Henry David Thoreau.

Roy and Winifred Slack, the owners of a dog named Gideon and the appellants in this case, have appealed the verdict of a Prince George's County jury which held them liable for personal injuries and a concurrent loss of consortium sustained by the appellees, Dorothy and Carl Villari. The injuries occurred when Dorothy Villari attempted to avoid an apparent confrontation with the appellants' dog. The jury returned a verdict for damages in the amount of $42,500 for Dorothy Villari's injuries and $2,500 for the accompanying privation of consortium.

The agreed statement of "Essential Facts" (*sans* transcript references) in this case appears as follows in this expedited appeal:

Between 8:30—9:00 p.m. on the night of June 12, 1979, Mr. and Mrs. Villari were taking their customary evening stroll along Caldran Drive in Clinton, Maryland. They were walking on a public sidewalk on Caldran Drive. As they were walking across a driveway, and while they were still on the public sidewalk, Mrs. Villari saw, out of the corner of her eye, something white. As they were walking she had a hold of her husband's arm. As she turned she saw a dog that was already in the air coming towards them. She heard a low growl and she saw teeth. At no time was the dog restrained by a leash.

In an attempt to protect herself from the dog, Mrs. Villari moved behind her husband. As she did so, her heel caught on something or in something which caused her body to twist. She lost her balance, and to keep from falling, she reached up to her husband to balance herself. As she did so, she felt a searing pain go from her back down through her leg all the way to her foot. At that time she was unable to move. She did not actually fall but had caught herself before she fell.

This incident occurred in front of the house owned by the appellants, Mr. and Mrs. Slack. Mrs. Slack was present in the carport area during the occurrence. The Villaris remained on the sidewalk prior to and during the occurrence and it occurred in the middle of the sidewalk. Mr. Edward V. Dorsey, Jr. from the Department of Public Works and Transportation testified that the sidewalk in front of the Slack's house was a dedicated right-of-way open for public use.

The dog did not touch or bite Mrs. Villari. Nor did it touch or bite Mr. Villari. The dog came down from the driveway towards the Villaris, got within a few inches of them, and was snarling and growling at them. Mr. Villari put his arm up to protect himself and the dog's mouth was right there next to his wrist where his watch was and he could feel the dog breath [*sic*] on him, but the dog did not bite him. The dog started to return to the house and then it came back at them again. The entire time the dog was near them Mr. Villari was yelling, "No! No! No!" At the same time Mr. Villari was yelling at the dog, Mrs. Villari thought she heard the word "house" and then the dog turned around and went back up to the house. From that time Mrs. Villari first saw the dog until the time it went back into the house she estimated that between 30 seconds to one minute passed.

Although Mr. and Mrs. Villari had walked past the house on many occasions, they had never seen the dog before. They did not know of anyone the dog had bitten, growled or snapped at before this incident. Mr. Villari did not fall or injure himself.

Mrs. Villari testified that the day after the occurrence she had a telephone conversation with Mrs. Slack. According to Mrs. Villari, Mrs. Slack said that had she known there was anyone in the driveway she would not have let the dog out of the backyard, and that she could not control the dog. Mrs. Slack could not recall all the details of the conversation but state[d], "... I am assuming she is not lying, so if I had said that it's—people are

normally afraid of large dogs and since he was a Doberman it was just the kind of thing you would just avoid." Mrs. Slack testified that she would not have said that she could not control the dog, but stated that if given conflicting commands the dog would obey her husband.

The Slacks had acquired the Doberman, "Gideon," as a five-week old puppy. They got him as a replacement for another Doberman who had been killed. Gideon was to serve as a special dog for the Slacks' first son, who was born with handicaps.

Mrs. Slack testified that Gideon had never previously behaved in the manner described by the Villaris. He had never bitten anyone; and had always been a calm dog. Although Mr. Slack principally trained the dog, Mrs. Slack never had any trouble controlling him. Mrs. Slack testified that on the night of the occurrence, she had let Gideon out in the backyard. She was preparing to let him in through the carport and Gideon heard or saw something. Instead of going into the kitchen door, the dog walked past Mrs. Slack. Mrs. Slack did not see anybody at the end of the driveway. When she called him, he came back. Mrs. Slack was not aware that anything had happened at the time. The next day she received a phone call from Mrs. Villari.

Mrs. Slack further testified that Gideon was normally kept in the house or fenced in the backyard. He did not bark at people, but would bark when the doorbell rang and at other dogs. Other children in the neighborhood came and played with him. Mr. and Mrs. Slack also testified that the dog had never growled at any person, and had chased other dogs three or four times in the nine to ten years the Slacks had owned him. According to a neighbor, John Szymkowicz, the dog did not cause problems in the neighborhood. Mr. Szymkowicz is a practicing attorney in the State of Maryland and stated that it was a good possibility that he did render an opinion to the Slacks as to what the dog law and dog attack laws were in the State of Maryland.

Gideon was described as a Doberman pinscher approximately 24 inches high at the shoulders and weighed at most five pounds heavier than as shown in Exhibit "1",
. . . .

At no time during this incident was the dog under restraint by a leash. When Mrs. Slack moved the dog from the backyard to the house she did not hold the dog by the collar. Prince George's County, Maryland has adopted a leash law which was the law at the time of this occurrence.

As a result of the injuries sustained by Mrs. Villari, she saw her doctor the following day and was put on muscle relaxers and ordered to bed. She went in the hospital for traction from June 25, 1979 to July 12, 1979. Subsequent thereto she returned to the hospital on September 11, 1979 where she remained until October 31, 1979 and underwent a fusion on the 4th and 5th lumbar vertebrae in the lower part of her back.

That as a result of the injuries sustained by Mrs. Villari, she incurred medical bills in excess of $20,000 plus lost wages from July of 1979 until November of 1981. The issues of her losses and the amount of the judgment is not at issue in this case.

At the conclusion of the case the appellants moved for a directed verdict on the grounds that there had been no showing of any primary negligence on the part of the appellees. Mr. Buchanan [attorney for appellants] argued that there was certainly no showing of any prior vicious conduct on the part of the dog and that there was absolutely no showing that they knew or should have known that this particular incident or occurrence had ever taken place before or that they had any knowledge that it might take place as described. Mr. Buchanan further argued that the leash law did not apply to this case and that the court should not have instructed the jury on the leash law. For the final arguments on this issue see the attached copies of the argument from the trial.

The court denied Mr. Buchanan's motion for directed verdict at the conclusion of the case and proceeded to instruct the jury.

In this appeal the Slacks contend that the trial court erred in denying their motion for directed verdict because:

A. A violation of the Prince George's County leash law, if proven, was not evidence of the type of negligence required to impose liability for personal injuries on owners of domestic animals.

B. Appellees did not prove that Appellants knew, or in the exercise of reasonable care should have known, that the dog "Gideon" had the propensity to do the acts which that [*sic*] caused injury.

■ Under current Maryland law, a dog owner may be responsible for the acts of his animal under two alternate theories of liability—negligence or strict liability, the latter arising from the owner's knowledge of the animal's propensities to cause harm. *See McDonald v. Burgess*, 254 Md. 452, 456, 255 A.2d 299, 301 (1969); *Finneran v. Wood*, 249 Md. 643, 241 A.2d 579 (1968); *Herbert v. Ziegler*, 216 Md. 212, 216, 139 A.2d 699, 702 (1958). We examine both.

–Negligence–

■ The type of negligence that exposes an animal owner who is unaware of the animal's dangerous propensities occurs in the failure to control the creature or prevent the harm caused by it. *See* Restatement (Second) of Torts, § 518 (1977). The degree of control required is generally held to be that which would be exercised by a "reasonable person," *see discussion, Arnold v. Laird*, 94 Wash.2d 867, 621 P.2d 138, 141 (1980) (*en banc*).

■ Under Maryland law, the violation of a statutory duty establishes a *prima facie* case of negligence where the violation is the proximate cause of the accident or injury, but does not constitute negligence *per se*. *Whitt v. Dynan*, 20 Md.App. 148, 154–55, 315 A.2d 122, 126–27 (1974). The same principle applies to the violation of a county ordinance.

*Paramount Development Corp. v. Hunter,* 249 Md. 188, 193, 238 A.2d 869, 871 (1968). In order for the violation of a statute to be evidence of negligence, that violation must result in an injury to a member of the class the statute was designed to protect and the injury sustained must be the type which the statute was intended to prevent. *Gardenvillage Realty v. Russo,* 34 Md.App. 25, 34, 366 A.2d 101, 107–08 (1976). These legal determinations are made by the trial judge. *Aravanis v. Eisenberg,* 237 Md. 242, 259, 206 A.2d 148, 157 (1965).

The particular ordinance at issue in this case provides, in pertinent part, that "[n]o owner of any dog *shall allow such animal to be at large* in the County. . . ." Prince George's County Code, § 3–106 (1979, 1982 Repl.Vol.) (emphasis added). Section 3–101(a) states that an "[a]nimal at large shall mean an animal not under restraint and off the premises of his owner." Further guidance is found in § 3–101(6), which says that an animal "under restraint" shall mean an animal: (1) secured by a leash or lead and under the control of a responsible person, or (2) confined within a vehicle, or (3) within the real property limits of its owner.

Therefore, the initial question to be answered is whether, under the facts in the case *sub judice,* the dog was in fact, "at large" within the meaning of the statute. At first blush, one might conclude that Gideon was "at large" at the time of the litigated occurrence. We note, however, that the penalty provided by § 3–106 for any dog whose owner shall allow him to be at large in the County is impoundment. It is inconceivable that the designers of this law had in mind the impoundment of a dog for merely straying onto the sidewalk in front of its owner's residence. Furthermore, the dog in question was under restraint, albeit verbal. There is no requirement that the animal be under leash or lead when on the premises of its owner. Considering the term "at large" further, we observe that § 3–108 provides: "In addition or in lieu of impounding a

dog found at large, a notice may issue to the known owner of such dog of the violation along with a cease and desist order." In our view this penalty was obviously not intended to flow from instances such as we have in the case at bar. To hold otherwise could lead to bureaucratic nonsense. Consequently, we maintain that Gideon was not "at large" as alleged.

■ Although we conclude that the dog in this case was not "at large," we will examine the claim that he was "allowed" to venture off of the private premises and was thus violative of the statute in question. The agreed statement of facts indicates that Mrs. Slack opened the gate to Gideon's enclosure to enable him to enter the house through the kitchen door. Instead, "the dog walked past Mrs. Slack." Moments after Gideon had proceeded beyond his mistress and down the driveway she called him; he returned immediately. Mrs. Slack testified that she was not aware of the incident with the Villaris. There is no indication that she knew the dog was going out of bounds, or that she "allowed" him to leave the premises. The mere accidental escape of an animal, without proof of the owner's knowledge or negligence, is insufficient evidence to constitute a violation of similar statutes couched in identical terms. See *Santanello v. Cooper*, 106 Ariz. 262, 475 P.2d 246 (1970); *Jett v. Norris*, 133 Ga.App. 596, 211 S.E.2d 639, *reh. den.* (1974). *See generally*, cases collected in 34 A.L. R.2d 1285, § 4 at 1289–91 and later case service; 4 Am. Jur.2d § 116, Animals, pp. 367–68. Absent proof of Mrs. Slack's negligence in failing to control Gideon, no violation of the statute occurred. The same incident might even have taken place had the dog been under a leash. Certainly the degree of care exhibited by Mrs. Slack was that of a "reasonable person."

Because there was no violation of the statute on the part of the Slacks, the court erred in failing to grant the motion for directed verdict on the issue of liability by way of the negligence hypothesis.

–Strict Liability–

The owner of an animal may be responsible for injuries caused by that animal under the principles of strict liability. Under this concept, the owner's liability arises from exposing the community to a known dangerous beast rather than any negligence in keeping or controlling his animal. Prosser, *Law of Torts*, § 76 at 449 (4th ed. 1971). Unlike the negligence theory of recovery, where liability attaches at the time of occurrence of the injury or damages, "[t]he gist of the [strict liability] action is the keeping of the animal after knowledge of its mischievious propensities." *Twigg v. Ryland*, 62 Md. 380, 385, 50 A.R. 226 (1884). In order to hold an animal owner liable under this theory, "the claimant must show that the owner knew, or by the exercise of ordinary and reasonable care, should have known, of the inclination or propensity of the animal to do the particular mischief that was the cause of the harm." *Herbert v. Zeigler, supra*, at 216, 139 A.2d at 702. *See also*, Restatement (Second) of Torts, § 508 (1977).

The Court óf Appeals discussed the knowledge or scienter required to hold the owner of an animal possessed of these tendencies responsible for the injuries inflicted in *Bachman v. Clark*, 128 Md. 245, 97 A. 440 (1916). There the Court said:

> [T]he owner's knowledge of the dog's vicious propensity need only be such as to put him on his guard, and to require him as an ordinary prudent person to anticipate the act or conduct of the dog resulting in the injury for which the owner is sought to be held liable.... The owner's knowledge of the propensity of the dog may be, and most generally is, acquired from its conduct and behavior, although such knowledge may be acquired from other persons, and in some cases the knowledge of others is imputed to the owner. [Citation omitted.]

*Id.* at 248, 97 A. at 441.

The Slacks contend that their motion for directed verdict should have been granted because the Villaris failed to

prove that the appellants knew or should have known of Gideon's propensity to commit the act alleged, *i.e.*, rushing or jumping at persons passing in front of "his" yard. Because there is not an iota of such evidence, we agree.

■ The standard for determining whether a directed verdict should be granted is extremely strict. "A directed verdict is inappropriate where there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact which if found to exist would prevent judgment for the moving party." *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 328–29, 389 A.2d 887, 905–06 (1978). Nonetheless, there are circumstances in which the directed verdict is appropriate. As we recently stated in *Cavalier Mob. Homes v. Liberty Homes*, 53 Md.App. 379, 454 A.2d 367, *cert. denied*, 295 Md. 736 (1983):

> Whenever the facts, and any rational inferences which may be drawn from them, point so strongly toward the non-existence of an essential element of a party's cause of action or defense that no reasonable man could find for its existence, the appropriate level of non-persuasion has been reached and a directed verdict is proper.

*Id.* at 385, 454 A.2d at 372.

■ Maryland courts have denied recovery by an injured plaintiff where he has failed to demonstrate the owner's scienter of the propensity of his animal to cause harm. The notice which will charge the owner or keeper with liability for the vicious or mischievous conduct of the animal must be notice that it is inclined to do the *particular mischief* that has been done. *Twigg v. Ryland, supra*, at 386, 50 A.R. at 226; *accord, Finneran v. Wood, supra*. In the case of a dog, notice that he is "fiercely disposed" toward cattle is *not* notice that he is similarly inclined to mankind. *Twigg, supra*, at 386, 50 A.R. at 227. Following the same reasoning, the *Finneran* Court held that evidence that a horse kicked at someone frightening her in her stall, or at other horses, was of scant significance in determining her

propensity to kick humans.  *Id.* at 647–48, 241 A.2d at 581–82.

██  Neither will the fact that the animal is regularly maintained in an enclosure or otherwise restrained, standing alone, constitute legally sufficient evidence tending to show the owner's knowledge of the animal's vicious propensities or inclination to bite people.  *McDonald v. Burgess, supra,* at 457–58, 255 A.2d 302.  In *McDonald,* the court dismissed the plaintiff's argument that, based on the earlier cases of *Goode v. Martin,* 57 Md. 606, 40 A.R. 448 (1882) and *Bachman v. Clark, supra,* evidence that the dog causing the damage in that case was always kept in a "run" or on a "strap," if outside the kennel, established that its owner was on notice of its vicious propensities.  The Court said:

> In *Goode v. Martin, supra,* our predecessors held the defendant might be presumed to have had knowledge that his dogs were fierce and dangerous from the fact that he was accustomed to keep them tied during the daytime.  These cases certainly are not authority for the proposition ... that it is not essential to establish facts which could put an owner on notice of the potentially vicious propensity of his animal.  The fact that the dogs here were kept in an enclosure in a suburban area in a day when legal restrictions frequently forbid a dog's running at large cannot have the same significance that the matter of enclosure had in 1916 [*Backman v. Clark* ] and 1882 [*Goode v. Martin* ].

*McDonald, supra,* at 458, 255 A.2d at 302.

The *McDonald* court also disabused the plaintiffs of the notion that the owner of the dog knew of his dog's vicious propensity because the particular breed—a German shepherd—was known to be dangerous.  The plaintiffs in that case supported their position with an affidavit from an officer of the Prince George's County Police Department's K–9 Corps which attested to the fact that this breed of dog "can and often does behave in a very vicious manner...."

The Court of Appeals held that the mere fact that the dog that injures a plaintiff belongs to a breed with an unsavory reputation, absent evidence that the *particular dog* was of a violent nature, is insufficient to prove scienter. *Id.* at 458–60, 255 A.2d at 302–03.

■ Turning to the canine culprit in the case *sub judice,* the record is clear that Gideon had never growled at, bitten, or previously attacked any person. He would bark at the sound of the doorbell and, on three or four times in nine or ten years, had chased other dogs. The Villaris' contention that Gideon presented a threat to humans and that his owners were aware of that danger rests on the following portion of the agreed statement of facts:

> Mrs. Villari testified that the day after the occurrence she had a telephone conversation with Mrs. Slack. According to Mrs. Villari, Mrs. Slack said that had she known there was anyone in the driveway she would not have let the dog out of the backyard, and that she could not control the dog. Mrs. Slack could not recall all the details of the conversation but state[d], "... I am assuming she is not lying, so if I had said that it's—people are normally afraid of large dogs and since he was a Doberman, it was just the kind of thing you would just avoid." Mrs. Slack testified that she would not have said that she could not control the dog, but stated that if given conflicting commands the dog would obey her husband.

Clearly the facts show that Mrs. Slack could and did control the dog. No other evidence was introduced to tarnish Gideon's tractable character or to establish notice of his propensity to engage in the injury-causing act. The fact that Gideon was a Doberman pinscher, standing alone, will not be considered a substitute for proof that this *particular* pinscher was of an obstreperous or violent nature. *McDonald, supra.* The fact that the Slacks were wont to maintain Gideon in an enclosure or inside the house, in light of the Court of Appeals' discussion in *McDonald, supra,* will not be used to imply any knowledge on their part of

Gideon's inclination to engage in the kind of activity that resulted in harm to Mrs. Villari.

Based on the record before us, what Gideon did on this unfortunate occasion appears to be an isolated, single occurrence. There was no evidence that he had, at any time, behaved similarly in the past; there was no knowledge chargeable to the defendants that he might do this particular act. What occurred was clearly not anticipated, nor could it have been. *Compare, Hamilton v. Smith*, 242 Md. 599, 219 A.2d 783 (1966) (nine year old boy was savagely attacked by three dogs; evidence established that dogs' owners were aware of previous biting incidents involving two of the dogs held sufficient to support finding that owners had actual knowledge of dogs' vicious propensities); *Herbert v. Ziegler, supra*, (evidence of horse owner's knowledge of his animal's propensity to cause harm found when rented horse, who bolted upon being startled by barking dog, was shown to have behaved similarly on previous occasion); *Bachman v. Clark, supra*, (evidence that bull terrier, who had bitten child without provocation, had snarled and jumped at pedestrians passing by his owner's property and had bitten and attempted to bite visitors on several occasions held sufficient to show owner's knowledge of dog's vicious propensities).

On the record before us, the Slacks' motion for directed verdict on the issue of liability, based on either theory, should have been granted.

*JUDGMENTS REVERSED.*

*COSTS TO BE PAID BY APPELLEES.*

ALPERT, Judge, dissenting:

The majority concludes that the Villaris failed to produce, as a matter of law, sufficient evidence of the Slacks' negligence and strict liability to survive a motion for directed verdict. In reaching this result, I believe that the majority has proceeded far beyond the accepted scope of appellate review by deciding factual issues and usurping the function

of the jury. Moreover, in my view, today's decision ignores the purpose of leash laws and overlooks the large body of caselaw which holds that these laws are not violated in the absence of some negligent act by the animal's owner. In my judgment, there was sufficient evidence whereby a jury could find the Slacks liable under either a negligence or strict liability theory. Accordingly, with due respect to my learned colleagues, I record this dissent.

### The Evidence

Pervading the majority's opinion are conclusions of fact which are in conflict according to the parties' agreed statement of facts. For example, the majority "maintain[s] that Gideon was not 'at large' as alleged" because the dog was "merely straying onto the sidewalk in front of its owner's residence" and was "under restraint, albeit verbal." According to the agreed statement of facts, when this incident occurred the Villaris were standing in front of the Slacks' house, "a dedicated right-of-way open for public use." Gideon "got within a few inches of them, and was snarling and growling at them." When Mr. Villari raised his arm to protect himself, "the dog's mouth was right there next to his wrist where his watch was and he could feel the dog breath [sic] on him, ..." From this statement of *fact*, I fail to see how the majority could conclude, *as a matter of law*, that Gideon was not "off the premises of his owner." See, Prince George's County Code § 3–101(2) (1979, 1982 Repl. Vol.). I believe it was for the jury to decide whether the dog was on or off the Slacks' property. In other words, I believe that based on the evidence adduced at trial, it was the jury's function to resolve whether Gideon was "at large."

Furthermore, I cannot abide by the majority's reliance on the vague possibility that Gideon was "under verbal restraint." The leash law requires that an animal be restrained by "a leash or lead ... or confined within a vehicle or within the real property limits of its owner." Prince George's County Code, § 3–101(6). Nowhere does this ordi-

nance countenance restraint by verbal command. Thus, Mrs. Slack's purported verbal restraint of her dog is irrelevant to the majority's analysis. Assuming for the sake of argument that "verbal restraint" would prevent a dog from being "at large," I once again find that the majority has reached its conclusion by deciding issues which rightfully should have been decided by the jury. Mrs. Villari testified that on the day following the attack Mrs. Slack informed her that "she could not control the dog." While it is true that Mrs. Slack denied making this comment, it is not the function of an appellate court to assess the credibility of witnesses and thus base its conclusion on Mrs. Slack's representation of her ability to control Gideon. Patently, it is the jury's function to decide such testimonial disputes.

The majority then goes on to determine, *as a matter of law*, that Mrs. Slack did not "allow" Gideon to run "at large." This determination is made through further judicial fact finding. The majority declares that "[m]oments after Gideon proceeded beyond his mistress and down the driveway [Mrs. Slack] called him; he returned immediately." Mrs. Slack merely testified that "[w]hen she called him, he came back." This testimony hardly connotes an immediate return. In fact, according to Mrs. Villari, "30 seconds to one minute passed" from the time she first saw the dog until it returned to the house. The agreed statement of facts explains, "The dog started to return to the house and then it came back at them again." Thus, it appears that the majority has acted as the trier of fact and accepted Mrs. Slack's testimony and disbelieved Mrs. Villari.

The majority further opines that "[t]here is no indication that [Mrs. Slack] knew the dog was going out of bounds, or that she 'allowed' him to leave the premises." Yet, Mrs. Villari testified that Mrs. Slack told her "that had she known there was anyone in the driveway she would not have let the dog out of the backyard, . . ." Manifestly, if Mrs. Villari's testimony is believed, a jury *could* find that "Mrs. Slack knew the dog was going out of bounds" if people were walking at the end of the driveway. Again, the

majority accepts Mrs. Slack's version of the events with no consideration of the testimony by the Villaris.

In my view, by opening the door to Gideon's enclosure and permitting the dog to leave the enclosure without a leash, Mrs. Slack "allowed" Gideon to walk unrestrained and risked the possibility that the dog might become "at large."

### Theories of Liability

The Slacks assert that it was error for the trial court to deny their motion for a directed verdict at the close of all the evidence because

A.   A violation of the Prince George's County leash law, if proven, was not evidence of the type of negligence required to impose liability for personal injuries on owners of domestic animals.

and

B.   The Villaris did not prove that the Slacks knew, or in the exercise of reasonable care should have known, that the dog 'Gideon' had the propensity to do the acts that caused injury.

They further posit that "assuming *arguendo* that breach of a provision of the ordinance might be evidence of negligence in some cases, it is submitted that on the facts of this case [the Villaris] were not entitled to an instruction on the leash law."

According to the Villaris, "[t]his action was submitted on alternate theories of general negligence and of [strict] liability based on scienter."

I concur with the majority's view that "[u]nder current Maryland law, a dog owner may be responsible for the acts of his animal under two alternative theories of liability— negligence or strict liability, ..." I believe, however, that the negligence theory of liability has never been fully explicated by a Maryland appellate court. These separate theories of recovery have frequently been blurred.

From the fact that danger is, in a sense, foreseeable from the keeping of wild beasts and vicious animals, some writers have concluded that the basis [for strict] liability is the negligence of the owner in keeping such animals, and dicta of this kind creep into the text books and decisions. This is not the classical common law doctrine. It is not always negligence in the legal sense to perform acts which involve foreseeable harm to others. Many activities which involve a high degree of probability or, indeed, a statistical certainty of harm to others are in no sense negligent. In the case of keeping dangerous animals, however, foreseeability of harmful consequences may be important in determining whether the harms are legal consequences of the keeping of the animal, or whether the owner had sufficient scienter of its dangerous propensities to charge him with strict responsibility. If notice of viciousness is present the owner of animals is liable irrespective of negligence or care on his part in keeping the animal, although the mere keeping the animal is not regarded as culpable. If there is not notice of the ferocious nature of the animal, the owner may, of course, still be liable for negligent keeping, but the basis of liability in the two cases must be sharply distinguished.

2 Harper & James, *The Law of Torts* § 14.11 at 833–34 (1956) (footnotes omitted).

## A. *Negligence*

The Restatement and other jurisdictions have acknowledged that an animal owner may be found liable without a demonstration of the owner's scienter of the animal's vicious propensity where the owner has acted negligently in controlling his animal. This view is expressed in Section 518 of the Restatement (Second) of Torts:

Except for animal trespass, one who possesses or harbors a domestic animal that *he does not know or have reason to know to be abnormally dangerous,* is subject to liability for harm done by the animal if, but only if,

(a) he intentionally causes the animal to do the harm, or

(b) *he is negligent in failing to prevent the harm.* (emphasis supplied).

A dog owner or keeper who has been negligent with respect to its keeping or control may be liable for injuries proximately resulting therefrom *irrespective of whether there was a known vicious propensity,* and negligence of a dog owner may consist of more than knowledge or cause to believe his dog is vicious or mischievous, although, if a dog has an opportunity to exercise a known vicious propensity through the negligence of the owner, he is, of course, liable, as where proper safeguards for protection are not taken, or the owner or keeper fails to restrain or confine the dog.

\* \* \* \* \* \*

In order to impose liability, the dog owner's negligence must be the proximate cause of an injury, which could reasonably have been anticipated, but it is not necessary to have foreseen the particular injury which did happen or the exact manner in which the injury occurred.

3A C.J.S. *Animals,* § 188 at 690–91 (1973) (emphasis supplied) (footnotes omitted).

The negligence cause of action was further articulated in *Arnold v. Laird,* 94 Wash.2d 867, 621 P.2d 138 (1980):

[A] negligence cause of action arises when there is ineffective control of an animal in a situation where it would reasonably be expected that injury could occur, and injury does proximately result from the negligence. The amount of control required is *that which would be exercised by a reasonable person* based upon the total situation at the time, including the past behavior of the animal and the injuries that could have been reasonably foreseen.

*Id.* at 141 (emphasis supplied). Recovery against a dog owner under the negligence approach has also been discussed in *DeRobertis v. Randazzo,* 94 N.J. 144, 462 A.2d

1260, 1267 (1983); *Miller v. Hurst,* 302 Pa.Super. 235, 448 A.2d 614, 618–19 (1982); *Butler v. Frieden,* 208 Va. 352, 158 S.E.2d 121, 123 (1967).

It is axiomatic that the duty, or standard of conduct, required by a reasonable person in a particular situation may be established by legislative fiat. *Volkswagen of America v. Young,* 272 Md. 201, 218, 321 A.2d 737 (1974). Under Maryland law, the violation of a statutory duty establishes a prima facie case of negligence where the violation is the proximate cause of the accident or injury, but does not constitute negligence *per se. Whitt v. Dynan,* 20 Md.App. 148, 154–55, 315 A.2d 122 (1974). The same principle applies to the violation of a county ordinance. *Paramount Development Corp. v. Hunter,* 249 Md. 188, 193, 238 A.2d 869 (1968).

> The distinction between mere 'evidence of negligence' and 'negligence *per se*' is very marked, in that in the former there must be an adjudication as to whether or not the violation constitutes negligence, whereas in the latter negligence necessarily follows the proof of the violation.... Hence the violation is generally said to be *prima facie* negligence, and the violator of the rule is given an opportunity to rebut the inference of negligence arising against him.

*Whitt v. Dynan, supra,* at 155, 315 A.2d 122 (citations omitted). In order for the violation of a statute to be evidence of negligence, that violation must result in an injury to a member of the class the statute was designed to protect and the injury sustained must be the type which the statute was intended to prevent. *Gardenvillage Realty v. Russo,* 34 Md.App. 25, 34, 366 A.2d 101 (1976). These legal determinations are made by the trial judge. *Aravanis v. Eisenberg,* 237 Md. 242, 259, 206 A.2d 148 (1965). Once it has been established that a relevant statute has been violated, "the jury must determine both whether the violation constitutes negligence and, if so, whether the violation is the proximate cause of the injury." *Whitt v. Dynan,* 20 Md.App. at 155, 315 A.2d 122.

The Slacks maintain that the purpose of the leash law is "to regulate activities of dogs within the County," and that a violation of this law does not give rise to a civil action against the owner of the animal. To support their argument, they point out that the leash law provides for fines and impoundment procedures. See, Prince George's County Code, §§ 3–106; 3–108, 3–109 and 3–104.2. Another provision of the Code specifically provides a procedure for recovery of damages by the owners of animals injured or killed by dogs. Prince George's County Code, § 3–118.[1] The Slacks suggest that the drafters of the Code could have provided, had they so desired, for civil liabilities to dog owners for injuries caused by their dogs running at large.

Caselaw from other jurisdictions does not support the Slacks' argument. Recently, the Superior Court of Pennsylvania stated that leash laws are "intended to protect the public from personal injury, property damage and other hazards caused by roaming dogs." *Miller v. Hurst,* 448 A.2d at 618. The Supreme Court (then Supreme Court of Appeals) of Virginia has declared that the purpose of a local leash ordinance was "to protect the public against hazards created by dogs running at large, including the most obvious hazard, dog bite." *Butler v. Frieden,* 158 S.E.2d at 123. Another court has opined that the purpose of running at large statutes is "to require an owner of a dog to maintain physical control over it or to prevent it from roaming the sidewalks or streets." *Searcy v. Brown,* 607 S.W.2d 937, 942 (Tex.Civ.App.1980). Leash laws are enacted "to protect persons and property from injury by dogs," *Alex v. Armstrong,* 215 Tenn. 276, 385 S.W.2d 110, 114 (1964), and "from unwarranted and unnecessary interference from animals running loose." *Endresen v. Allen,* 574 P.2d 1219, 1224 (Wyo.1978).

A similar policy of protecting the public is evidenced by statutes relating to animals running at large on the high-

---

**1.** Maryland Ann.Code, art. 56, § 198 (1983 Repl.Vol.) provides a similar provision for certain Maryland counties.

way. The purpose of these statutes "is not only to protect persons and property off the highways, but also to protect persons on the highway and their property." *Corey v. Smith,* 233 Ind. 452, 120 N.E.2d 410, 412 (1954). *Accord, Griffin v. Benton,* 92 Ga.App. 167, 88 S.E.2d 287, 288 (1955) (purpose is to protect the general public from "the evils" of animals running at large); *Mitchell v. Ridgway,* 77 N.M. 249, 421 P.2d 778, 780 (1966) (purpose is to protect the motoring public). *But see, Shuck v. Cook,* 494 P.2d 306, 308–09 (Okla.1972) (purpose of Oklahoma's Herd Law is to protect crops from ravages of *trespassing* domestic animals rather than motorists on the highway). *See also* Annot., 59 A.L.R.2d 1328, 1337–40 (1958).

The majority posits that "[i]t is inconceivable that the designers of this law had in mind the impoundment of a dog for merely straying onto the sidewalk in front of its owner's residence." To my mind, impoundment merely removes an "at large" canine from the community. I discern no reason why a person injured by an animal which is "allowed" to be "at large" may not seek redress from the leash law violator through civil action. I base this belief on what I perceive to be the intent and purpose of leash laws. Thus, I conclude that Prince George's County's leash law is designed to protect the public from encounters with unattended dogs and the type of injuries which result from such encounters. I perceive the ordinance as establishing a standard for determining whether the dog owners exercised the appropriate duty of care for controlling their animal. *See, Butler v. Frieden,* 158 S.E.2d at 123.

I observe that other jurisdictions have generally held that statutes providing that an owner shall not "permit" or "allow" an animal to run at large are not violated in the absence of negligence by the animal's owner. *E.g., Clark v. Moore,* 341 So.2d 116, 118 (Ala.1976) (an owner "allows" the animal to run at large when failing to exercise reasonable care in controlling the animal); *Santanello v. Cooper,* 106 Ariz. 262, 475 P.2d 246, 250 (1970) ("allow" means to approve of, to sanction, to permit, or to acknowledge that

an animal is at large); *Prickett v. Farrell,* 248 Ark. 996, 455 S.W.2d 74, 78 (1970) ("allow" means to permit by neglect to restrain or prevent); *Peterson v. Pawelk,* 263 N.W.2d 634, 637 (Minn.1978) ("permit" indicates that even though an owner has no knowledge that animal is running loose, the owner has in some way negligently allowed it to do so); *Keefer v. Hartzler,* 351 S.W.2d 479, 481 (Mo.Ct.App. 1961) (jury may infer negligence on the part of an owner from the fact that animal was at large). *See also* Annot., 34 A.L.R.2d 1285, 1289–91 (1954); 4 Am.Jur.2d *Animals* § 116 at 367–68 (1962, 1983 Cum.Supp.).

Thus, I conclude that animal restraint cases should be viewed under the following analysis. First, the owner permits or allows the animal to run at large through some action or inaction. Next, it is shown that some injury or damage resulted from the animal being unrestrained. Where a plaintiff demonstrates that the owner has permitted or allowed the animal to run at large, the plaintiff has shown evidence that the owner has violated the animal control statute through some negligent act and has generated a jury question.

The jurisdictions are divided on the effect of a violation of a leash law. Some states impose absolute liability for damages caused by roaming dogs. *See, e.g.,* the discussion of New Jersey's dog owner's liability statute, N.J.Stat.Ann. § 4:19–16 (West 1973, 1983–84 Cum.Supp.),[2] in *DeRobertis*

---

**2.** That statute provides:

The owner of any dog which shall bite a person while such person is on or in a public place, or lawfully on or in a private place, including the property of the owner of the dog, shall be liable for such damages as may be suffered by the person bitten, *regardless of the former viciousness of such dog or the owner's knowledge of such viciousness.*

For the purpose of this section, a person is lawfully upon the private property of such owner when he is on the property in the performance of any duty imposed upon him by the laws of this state or the laws or postal regulations of the United States, or when he is on such property upon the invitation, express or implied, of the owner thereof.

(emphasis supplied).

*v. Randazzo,* 462 A.2d at 1263–65. *See also* 4 Am.Jur.2d *Animals,* § 88 at 335–37 (1962, 1983 Cum.Supp.). Cases from other jurisdictions imposing absolute liability are collected at *Miller v. Hurst,* 448 A.2d at 618 n. 7. Some states hold that the violation of a leash law is negligence *per se.* E.g., *Downing v. Lillibridge,* 39 Colo.App. 231, 566 P.2d 714, 716, *cert. denied,* (1977); *Corey v. Smith,* 120 N.E.2d at 412; *Pigman v. Nott,* 305 Minn. 512, 233 N.W.2d 287, 288 (1975); *Miller v. Hurst,* 448 A.2d at 618–19; *Alex v. Armstrong,* 385 S.W.2d at 113–14. As the majority has noted, in Maryland the violation of a statute or ordinance is evidence of negligence and not negligence *per se.*

Turning to the facts of the case at bar, I find that evidence was elicited showing that the Slacks had not complied with the leash law. Mrs. Slack's "allowing" Gideon to run at large was not an accident. She knew the dog was loose. The dog did not jump over a fence to get to the Villaris. A child or neighbor did not inadvertently set Gideon loose. Mrs. Slack's actions violated the standard of care established by the leash law and demonstrated evidence of negligence. Moreover, the trial judge could find that the Villaris were included in the class of people the ordinance was designed to protect and that Mrs. Villari suffered an injury the law attempted to prevent. It is not unreasonable to expect that one endeavoring to avoid an unleashed dog might sustain an injury of the type sustained by Mrs. Villari. Such an event was clearly foreseeable. For an excellent discussion of foreseeability in negligent "dog fright" cases, see *Endresen v. Allen,* 574 P.2d at 1221–22. *See also* 4 Am.Jur.2d *Animals* § 114 at 364 (1962, 1983 Cum.Supp.). Other "dog fright" cases include *Farrior v. Payton,* 57 Hawaii 620, 562 P.2d 779, 787 (1977); *Henkel v. Jordon,* 7 Kan.App.2d 561, 644 P.2d 1348, 1351–52 (1983); *Machacado v. City of New York,* 80 Misc.2d 889, 365 N.Y.S.2d 974, 976 (N.Y.Sup.Ct.1975).

I would hold that Mrs. Slack's violation of the Prince George's County leash law could properly be considered by

the jury as evidence of a negligent act which proximately caused Mrs. Villari's injuries.

## B. *Strict Liability*

The owner of an animal may also be liable under principles of strict liability. This type of liability is not based on an owner's negligent acts in keeping or controlling the animal. Instead, the owner's liability arises from exposing the community to a dangerous animal. Prosser, *Law of Torts* § 76 at 449 (4th ed. 1971). Unlike the negligence theory of recovery, where liability attaches on the immediate occurrence of the injury or damages, "[t]he gist of the [strict liability] action is the keeping of the animal after knowledge of its mischievous propensities." *Twigg v. Ryland*, 62 Md. 380, 385, 50 A.R. 226 (1884).

Maryland has subscribed to the strict liability theory of recovery for domestic animal-related injuries for over one hundred years. The law was summarized by Chief Judge Hammond for the Court of Appeals in *Herbert v. Ziegler*, 216 Md. 212, 216, 139 A.2d 699 (1958):

> To hold liable the owner of a domestic animal that has caused injury, the claimant must show that the owner knew, or by the exercise of ordinary and reasonable care should have known, of the inclination or propensity of the animal to do the particular mischief that was the cause of the harm.[3]

The knowledge or scienter required to hold the owner of an animal possessed of vicious characteristics responsible

---

**3.** Thus, Maryland law closely tracks Section 508 of the Restatement (Second) of Torts. That Section provides:
> (1) A possessor of a domestic animal that he knows or has reason to know has dangerous propensities abnormal to its class, is subject to liability for harm done by the animal to another, although he has exercised the utmost care to prevent it from doing the harm. (2) This liability is limited to harm that results from the abnormally dangerous propensity for which the possessor knows or has reason to know.

for the injuries inflicted was fully discussed in *Bachman v. Clark*, 128 Md. 245, 248, 97 A. 440 (1916):

> [T]he owner's knowledge of the dog's vicious propensity need only be such as to put him on his guard and to require him as an ordinary prudent person to anticipate the act or conduct of the dog resulting in the injury for which the owner is sought to be held liable. The owner's knowledge of the propensity of the dog may be, and most generally is, acquired from its conduct and behavior, although such knowledge may be acquired from other persons, and in some cases the knowledge of others is imputed to the owner.

(citation omitted). Appellants posit that their motion for directed verdict should have been granted because appellees made an insufficient showing that appellants knew or should have known of Gideon's propensity to commit the act alleged in the case *sub judice.*

The first Maryland case discussing a dog owner's strict liability was *Goode v. Martin*, 57 Md. 606 (1882). Early on a Sunday morning, a young boy approached the defendant's house to purchase milk. The boy rattled on the fence's gate and was startled by the defendant's barking dogs. The defendant's daughter calmed the dogs, placed the dogs in the blacksmith shop, and assured the boy it was safe to enter. The girl departed to get the milk. While the boy awaited her return, the dogs attacked him. The defendant explained that he would usually chain the dogs every morning, but had not secured the dogs that Sunday morning because he had slept late. One of the defendant's workers related that in the past the dogs had barked at him when he passed them. The dogs had never bitten anyone prior to this incident. The Circuit Court directed a verdict in the defendant's favor. The Court of Appeals reversed. "[T]he defendant may be presumed to have knowledge that his dogs were fierce and dangerous from the fact that he was accustomed to keep them tied during the daytime." *Id.* at 611. Thus, the jury should have been permitted to decide

whether this evidence tended to prove that the owner had scienter of the dogs' vicious dispositions.

In *Hamilton v. Smith*, 242 Md. 599, 219 A.2d 783 (1966), a nine year old boy was savagely attacked by three dogs. The plaintiff introduced evidence showing that the dogs' owners were aware that one of the dogs had bitten a stranded motorist five days before the subject incident. Also, it was established that another of the dogs had bitten one of the owner's employees two months prior to the attack on the boy. There was no evidence produced regarding an attack by the third dog. Upon this record, the Court of Appeals found the evidence sufficient to support a finding that the owners had actual knowledge of the dogs' vicious propensities.

Evidence of a horse owner's knowledge of a horse's propensity for harm was found in *Herbert v. Ziegler, supra*. In that case, an eleven year old boy was thrown from a horse when the horse was startled by a growling and barking dog. The boy's father had rented the horse from a riding stable. The boy introduced testimony tending to show that this particular dog had frightened the horse on previous occasions. Accordingly, the Court of Appeals held the horse's owner had knowledge of the horse's habit of throwing its rider when approached by the dog.

A pet store parrot bit a store customer in *May Co. v. Drury*, 160 Md. 143, 153 A. 61 (1931). The parrot had been let loose in the store while its cage was being cleaned. The bird sat on the plaintiff's finger and then did its damage. The plaintiff alleged the store had been negligent in permitting the parrot to be unrestrained. Prior to addressing the question, the Court of Appeals looked for evidence of the store's employees' knowledge of the parrot's propensity to bite. Testimony revealed that the bird was caged at all times except when its cage was being cleaned and that during this maintenance time store customers were told to "keep away from the birds." This evidence was deemed sufficient to submit the issue of scienter to the jury.

In *Bachman v. Clark, supra,* a ten year old boy while standing on a public sidewalk, was bitten by a bull terrier. Witnesses to the attack discerned no provocation on the boy's part. Several trial witnesses related their prior experiences with the dog. Each had been snarled at and growled at by the bull terrier. One had his coat torn. This was sufficient evidence to show the dog's inclination towards mayhem. The *Bachman* Court then considered whether the evidence was sufficient to show the dog's owner had knowledge of the dog's inclinations. Testimony showed the owner was aware that the dog would jump on visitors to the house and that the dog became excited and ran along the owner's fence attempting to bite passersby. Moreover, the owner testified that the dog was always kept in the enclosed yard and that it was never taken off the property without a leash. The Court of Appeals ruled this evidence was

> properly submitted to the jury as tending to show that the conduct of the dog, which was known to the defendant, was sufficient to put her on guard or require as an ordinary prudent person to anticipate the act of the dog resulting in the injury to the plaintiff.

128 Md. at 250.

Recovery by an injured plaintiff has been denied in cases where scienter of vicious propensity was not demonstrated. *McDonald v. Burgess,* 254 Md. 452, 255 A.2d 299 (1969); *Finnerman v. Wood,* 249 Md. 643, 241 A.2d 579 (1968); *Twigg v. Ryland,* 62 Md. 380, 50 A.R. 226 (1884).[4]

My review of the relevant Maryland case law leads me to the conclusion that the Villaris' evidence created a jury question on the issue of whether the Slacks knew or should have known of Gideon's propensity to cause harm. The dog

---

**4.** Two other cases mentioning the scienter strict liability theory of recovery are not relevant to my discussion of this case. *See, Bramble v. Thompson,* 264 Md. 518, 287 A.2d 265 (injuries sustained by *trespassing* plaintiffs) and *Mazur v. Scavone,* 37 Md.App. 695, 378 A.2d 1355 (1977) (hearsay evidentiary issue in dog bite case).

was ordinarily kept in the fenced backyard or the Slacks' house. This type of evidence was deemed adequate to generate a jury question on scienter in *Goode v. Martin, supra, May Co. v. Drury, supra, Bachman v. Clark, supra.*[5] While the dog had not previously bitten or attacked a human being, there was evidence that the Slacks were aware that Gideon had chased other dogs and would become excited by the sound of the doorbell or the appearance of other dogs. Critically (if Mrs. Villari is believed), Mrs. Slack admitted she would not have permitted Gideon to run down the driveway had she known of the Villaris' presence.

In my view the Villaris produced sufficient evidence to generate a jury question under the strict liability (scienter) cause of action.

## JURY INSTRUCTIONS

As the majority held that the Slacks' motions for directed verdict should have been granted, it was not necessary for my colleagues to discuss the challenged jury instructions. Under my analysis of this case, a review is required.

The trial judge first accurately articulated the showing required to find a dog owner liable under the strict liability (scienter) theory. Immediately thereafter, the trial judge told the jury that if they found that the purpose of the leash

---

**5.** The majority opines that,

In *McDonald* [*v. Burgess, supra* ], the Court dismissed the plaintiff's argument that, based on the earlier cases of *Goode v. Martin,* 57 Md. 606, 40 A.R. 448 (1882) and *Bachman v. Clark,* [128 Md. 245, 97 A. 440 (1916) ], evidence that a dog causing the damage in that case was always kept in a 'run' or on a 'strap,' if outside the kennel, established its owner was on notice of its vicious propensities.

I recognize that the *McDonald* Court stated that the fact that an animal is kept in an enclosure would not have the *same* significance today that the matter of enclosure had when *Bachman* and *Goode* were decided. Nevertheless, *McDonald* did not negate entirely the "significance" of enclosing a dog when considering a dog owner's scienter of his animal's vicious propensities. Enclosure is but one of several factors to be considered in the "knowledge of vicious propensity" equation.

law was to prevent accidents such as the one incurred by Mrs. Villari, then the jurors could consider the violation as evidence of the Slacks' negligence. The Slacks' counsel excepted to the latter instruction, maintaining that the jurors could also find that the leash ordinance's purpose was to prevent dogs from running at large. Before this Court, the Slacks complain that the entire leash law instruction was improper because "[t]here is simply no logical nexus between the failure to restrain a dog by a leash and the harm suffered, in the absence of proof of notice of vicious propensity."

By altering their reason for objecting to the trial court's instructions, the Slacks have utterly failed to comply with Maryland Rule 554 e. That rule restricts appellate review to "the grounds of objection distinctly stated" at trial. The rule's objective is to afford the trial judge an opportunity to consider the alleged erroneous instruction and to make additions or corrections where necessary. *Sherrard v. Hull*, 53 Md.App. 553, 576, 456 A.2d 59, *aff'd*, 296 Md. 189, 460 A.2d 601 (1983).

I do, however, observe that the lower court failed to elaborate on the ordinance's use of the word "allow." I believe that some sort of explanation of this term, as it related to this case, would have been useful to the jury. Also, the trial judge should not have permitted the jurors to interpret the purpose of the leash law. It is the function of the court, and not the jury, to interpret statutes. *Aravanis v. Eisenberg*, 237 Md. at 259, 206 A.2d at 157.

Nevertheless, I cannot help but notice that, as a whole, the Slacks received more favorable instructions than they were entitled to. The trial judge informed the jury that a finding of scienter was required for the Villaris to succeed on the negligence cause of action. With this opinion I have attempted to dispel any such notion. Consequently, the jury charge increased the Villaris' burden of proof and made it more difficult for the jury to find against the Slacks. As a result of this increased burden, even if the

evidence were insufficient under the scienter theory, the Villaris should still be permitted to recover. Any error in submitting the scienter issue to the jury was undoubtedly harmless error because the trial judge's instructions made the Villaris prove more than the law required. While I do not mean to place my imprimatur on the instruction given at the trial below, I cannot say that these less-than-perfect instructions mandate reversal.

It is my conclusion that the court below acted properly and that the judgments entered in favor of the Villaris should be affirmed.