## 𝕾taunton

NELLIE BRADSHAW v. MELVIN J. MINTER.

September 10, 1965.

Record No. 6004.

Present, All the Justices.

*Israel Steingold* (*James M. Hubbard; Steingold, Steingold & Chovitz*, on brief), for the plaintiff in error.

*E. L. Ryan, Jr.* (*White, Ryan & Reynolds*, on brief), for the defendant in error.

EGGLESTON, C. J., delivered the opinion of the court.

Nellie Bradshaw, sometimes hereinafter called the plaintiff, while a social guest of Melvin J. Minter at the latter's home, was injured when she fell from a saddle horse owned by Minter. She filed a motion for judgment against him to recover damages for her injuries, alleging that he was "guilty of negligence" which proximately caused her injuries in that he knew that the horse was "nervous, unbroken or wild in nature and unfit for normal riding purposes" and yet invited her to ride the animal without warning her of its "dangerous propensities."

At a trial before a jury, at the instance of the defendant the lower court ruled and instructed the jury that the plaintiff was not entitled to recover of the defendant unless she proved by a preponderance of the evidence that he was guilty of "gross negligence" which proximately caused her injuries. The trial resulted in a verdict and judgment for the defendant. We granted the plaintiff a writ of error.

In her assignments of error the main contention of the plaintiff is that the lower court erred in holding that in order for her to prevail in her suit she was required to prove that her injuries were proximately caused by his "gross negligence" rather than by his "ordinary negligence." The other assignments of error relate to the court's rulings on the admission of evidence.

On April 8, 1962, Mrs. Bradshaw, her husband and their three children were social guests in the Minter home, as they had been on previous occasions. After having talked awhile, Minter took two of the children for a short ride with him on his saddle horse, "Buckshot." Upon their safe return, according to the testimony of Mrs. Bradshaw and that of her husband, Minter invited her to ride and she accepted the invitation. According to Minter, Mrs. Bradshaw requested that she be allowed to ride and he consented. At any rate, while Minter held the reins, Mrs. Bradshaw mounted the horse. According to her testimony, as soon as Minter had turned the reins over to her the horse suddenly "took off" at a rapid rate, she was unable to control it or hold her seat in the saddle, and fell to the ground and was injured.

Mrs. Bradshaw testified that she had never had any lessons in riding and had only been on a horse "about two or possibly three times" when she was about twelve or thirteen years old. She further testified that before mounting the horse on this occasion, Minter did not ask her about her previous experience in riding. Furthermore, she, as well as her husband, said that Minter gave her no directions as to how she should manage the horse nor told her of its characteristics.

While Minter agreed that Mrs. Bradshaw's previous riding experience was not discussed, he said that he told her that the horse was "neck-reined," would run if the reins were lifted, and that she should "hold the reins low" to prevent its running. Minter further testified that when he released the reins to Mrs. Bradshaw she lifted them "above her head" which induced the horse to run. According to his testimony, the horse had gone "about fifty yards" and was making a normal turn when Mrs. Bradshaw fell from the saddle.

Minter had purchased the horse in August, 1961, for his fourteen-year-old daughter. She had ridden the horse frequently during the past fifteen months without incident, except on one occasion when it "ran away" with her while she was racing.

The evidence is undisputed that the horse was gentle and not mean or vicious. But Minter admitted that he knew it was "spirited," "liked to run," and would run if the rider "lifted the reins." Indeed, he said that if the rider "held the reins high," this was a "signal" for the horse to run.

Ronald E. Dudley, to whom Minter later sold the horse, testified that it was a "high-strung, nervous animal," and was not a "good horse" to be ridden by an inexperienced woman.

This brings us to the main issue in the case—the standard of care owed by the defendant, Minter, to the plaintiff, Mrs. Bradshaw, who was a social guest on his premises at the time of the accident. While we have not previously dealt with the question, the prevailing common-law view is that "a social guest, however cordially he may have been invited and urged to come, is not in law an invitee, but is nothing more than a licensee, to whom the possessor [of land] owes no duty of inspection and affirmative care to make the premises safe for his visit." Prosser, Law of Torts, 2d Ed., § 77, p. 447. As is said in 2 Harper & James, The Law of Torts, § 27.11, p. 1477, the social guest "is an invitee who is not an invitee" and "the great weight of Anglo-American authority classifies him as a bare licensee, even though he was expressly invited." See also, 38 Am. Jur., Negligence,

§ 117, p. 778; Annotation, 25 A.L.R. 2d 598; 65 C.J.S., Negligence, § 32b, pp. 487-8; *Id.*, § 43(4)g, p. 519.

Restatement of the Law of Torts, Vol. 2, § 331, p. 896, characterizes a social guest as a "gratuitous licensee."

The only jurisdictions which have considered the question explicitly and have declined to follow the general rule are Louisiana and Ohio where it is held that a social quest is an invitee. See *Alexander* v. *General Accident Fire & Life Assur.* Corp. (La. App. 1957), 98 So. 2d 730; *Scheibel* v. *Lipton*, 156 Ohio St. 308, 102 N.E. 2d 453.

In Virginia we have adhered to the general rule that no duty is imposed upon the owner or occupant to keep his premises in a safe and suitable condition for the use of a licensee, and that so far as the condition of the premises is concerned the owner or occupant is only liable for any willful or wanton injury that may be done to him. 13 Mich. Jur., Negligence, § 17, p. 523, and cases there collected. See also, Prosser, Law of Torts, 2d Ed., § 77, p. 445; 38 Am. Jur., Negligence, § 105, p. 767; 65 C.J.S., Negligence, § 35a, p. 491.

However, the textwriters and the later cases hold that a different rule applies where a guest is injured by reason of the activities of the host which may constitute active or affirmative negligence as distinguished from passive negligence, that is, the condition of the premises. Where the activities of the host are involved, the test should be one of reasonable care under the circumstances. As is said in Restatement of the Law of Torts, Vol. 2, § 341, p. 929:

"*Activities dangerous to licensees.*

"A possessor of land is subject to liability to licensees, whether business visitors or gratuitous licensees, for bodily harm caused to them by his failure to carry on his activities with reasonable care for their safety, unless the licensees know or from facts known to them, should know of the possessor's activities and of the risk involved therein."

The principle is thus stated in 2 Harper & James, The Law of Torts, § 27.10, p. 1475:

"There are a good many dicta—mostly in older cases—and some holdings to the effect that the occupier of land owes the bare licensee no greater duty than to refrain from intentional, or willful or wanton, misconduct towards him. 'The prevailing view is to the contrary, however, and it is now generally held that in cases involving injury resulting from *active conduct*, as distinguished from conditions of the premises, the landowner or possessor may be liable for failure to

exercise ordinary care towards a licensee whose presence on the land is known or should reasonably be known to the owner or possessor.' [Quoting from *Oettinger* v. *Stewart*, 24 Cal. 2d 133, 138, 148 P. 2d 19, 22.]

"* * * At any rate, there is well-nigh universal agreement that the duty of care is owed to licensees whose presence is to be expected. And, of course, the duty of care to the licensee whose presence is actually known is clear."

See also, Prosser, Law of Torts, 2d Ed., § 77, p. 445.

We have frequently applied this principle in dealing with the liability of a railroad to a licensee. 15 Mich. Jur., Railroads, § 50, pp. 276-7; 16 Va. & W. Va. Digest, Railroads, § 358(1).

*Brooks* v. *Mack*, 222 Or. 139, 352 P. 2d 474, involved an accident quite similar to that with which we are here concerned. There a social guest, an inexperienced horseback rider, was thrown from a horse owned by the host. It was there held that it was for the jury to determine whether the defendant host was negligent in permitting an inexperienced guest to ride an unsafe horse and whether the plaintiff guest assumed the risk of such riding.

In *Cunag* v. *McCarthy*, 42 Ill. App. 2d 36, 191 N.E. 2d 404, a social guest was injured while operating a tractor on the premises of the host. It was held that the evidence presented a jury question as to whether the defendant host was negligent in failing to warn the plaintiff guest of the proper manner in which to operate the tractor.

In *Potts* v. *Amis*, 62 Wash. 2d 777, 384 P. 2d 825, a social guest was injured when struck by a golf club which the host was demonstrating in the latter's home. It was held that a jury question was presented as to whether the defendant host had exercised ordinary care to avoid inflicting injuries upon the plaintiff guest.

For a collection of cases involving "Liability to social guest injured otherwise than by condition of premises," see Annotation, 79 A.L.R. 2d 990.

In the present case the defendant relies upon *Smith* v. *Allen*, 4 Cir., 297 F. 2d 235, and *Boggs* v. *Plybon*, 157 Va. 30, 160 S.E. 77. Each is distinguishable. The *Smith* case dealt with the Virginia law involving injury to a social guest because of a defect in the host's premises. There it was held that with respect to the condition of the premises the host was liable to the guest only for gross negligence. No question of the active negligence of the host was involved.

The *Boggs* case involved the liability of a host driver of an auto-

mobile to his guest passenger for gratuitous transportation. We there held that since this was a gratuitous undertaking by the host for the benefit of the guest passenger gross negligence must be shown. 157 Va. at 38, 39. The principle announced in that case was incorporated in our statute law by Acts of 1938, ch. 285, p. 417 (Code, Repl. Vol. 1957, § 8-646.1).

In the case now before us the host furnished to his guest no benefit beyond the social courtesy of inviting or permitting her to ride the horse. Moreover, the legislature has not seen fit to apply the principle announced in the *Boggs* case to a situation such as we have in the present case. See *Walthew* v. *Davis, Adm'r*, 201 Va. 557, 111 S.E. 2d 784.

Our conclusion is that the lower court erred in holding and instructing the jury that the plaintiff guest was not entitled to recover of the defendant host except upon a showing of gross negligence on his part; that proof that the defendant was guilty of ordinary negligence or lack of ordinary care which was a proximate cause of the plaintiff's injuries will suffice.

While, as has been said, there is no evidence that this horse was vicious, there is ample evidence to warrant the finding that it was unsafe or untrustworthy for an inexperienced rider and that the defendant knew or should have known this.

Accepting the testimony of Mrs. Bradshaw and her husband as true, it was for the jury to say whether the defendant was guilty of ordinary negligence in inviting or permitting her to ride this horse without first ascertaining whether she was an experienced and capable rider, without warning her of the characteristics and propensities of the animal, and the dangers incident to the situation. We likewise hold that it was for the jury to say whether the plaintiff was guilty of contributory negligence or assumed the risk of an accident in riding the horse under the related circumstances.

During the trial the plaintiff offered to prove by her husband that in her conversation with the defendant after the accident the defendant stated that "he knew that the horse was dangerous and that was why he got homeowners insurance to protect himself against anybody being hurt." Upon objection by counsel for the defendant, the lower court ruled that while the defendant's statement that he knew the horse was dangerous was admissible as a declaration against interest, the remainder of the statement as to his having procured insurance on the risk was not admissible. The plaintiff excepted to this ruling but pursued the matter no further.

The assignment of error as to this ruling is entirely without substance. As the lower court suggested, while the defendant's admission that he knew that the horse was dangerous was relevant on the issue of whether he was negligent in inviting the plaintiff to ride the animal, the fact that he may have protected himself against risk by liability insurance threw no light on the issue and was quite immaterial thereto.

■ Error is likewise assigned to the action of the lower court in excluding from the evidence the statement of Mrs. Minter to her husband, made shortly after the accident, that "I told you, Mel, to get rid of that horse," and the fact that Minter made no reply thereto. It is argued that the failure of the defendant to reply to the remark was a "tacit admission" that he knew that the horse was of a dangerous nature and unfit for riding. While the evidence was technically admissable its probative value was slight, especially in view of other evidence that the horse was unsafe for riding.

For the error of the lower court in its ruling as to the degree of care which the defendant owed the plaintiff, the judgment is reversed, the verdict set aside, and the case remanded for a new trial.

*Reversed and remanded.*