## FINNERAN, ET AL. *v.* WOOD

[No. 212, September Term, 1967.]

644

*Decided May 8, 1968.*

The cause was argued before HAMMOND, C. J., and HORNEY, McWILLIAMS, FINAN and SINGLEY, JJ.

*Joseph F. McBride,* with whom were *Bill L. Yoho, Robert S. Hoyert, Roy W. Hooten* and *Hoyert & Yoho* on the brief, for appellants.

*Wilbur D. Preston, Jr.,* with whom were *William B. Whiteford* and *Due, Whiteford, Taylor & Preston* on the brief, for the appelleee.

McWILLIAMS, J., delivered the opinion of the Court.

The central figure in this contretemps is an 8 year old 16 hand bay mare of dubious lineage, named Tiara. She belongs to the appellee (Wood) who had stabled her, temporarily, on the property of the appellants (the Finnerans). On 7 February 1964 Tiara kicked Merna Finneran in the face inflicting injuries both severe and painful. On 7 September 1965 the Finnerans sued Wood in the Circuit Court for Prince George's County. On 4 August 1966 the case was removed to the Circuit Court for Calvert County. After the rather extensive discovery proceedings had come to an end the case was tried before Loveless, J., and a jury on 11 and 12 May 1967. At the conclusion of the Finnerans' case the court directed a verdict for Wood.

In our consideration of the Finnerans' appeal we shall consider the evidence and all logical and reasonable inferences deducible therefrom in a light most favorable to them. *Raff v. Acme Markets, Inc.*, 247 Md. 591, 233 A. 2d 786 (1967).

Wood's three young daughters were daft about horses but, he told them, he would not consider buying a horse for them until a proper stable could be found. The Finnerans, who lived within a half mile of Wood, had a barn on their property. They allowed a neighbor to keep an old horse (Rock) in the barn and to let him graze in the adjoining fenced area which they called the corral. They turned aside, however, the oft-repeated requests of the Wood children to stable a horse there because they felt it would be detrimental to the operation of the miniature golf course they had built alongside of the corral and adjacent to their dwelling house.

In the fall of 1963 a neighbor gave Wood permission to use some of his land as a corral if Wood would provide the fence. Tiara was purchased before the fence was started and the Finnerans agreed that their barn and corral could be used until it was finished. A week or so after Tiara was installed on the Finnerans' property Wood bought Cashew, a 14.2 hand strawberry roan gelding. He was put into the corral along with Tiara and Rock. Finneran laid it down rather firmly that Wood would be fully responsible for the care and maintenance of Tiara and Cashew.

The Finnerans were away during most of December and January. It was about 8 o'clock on the morning of 7 February 1964 when Mrs. Finneran looked out of her kitchen window and saw Tiara "trying to eat grass on the other side of the white [post and rail] fence [enclosing the corral]. She kept pushing, pushing, pushing, and finally one end [of] one [of] the rails came loose. Then she pushed it further with her body and stepped over [the lower rail] into * * * [their] golf course." Mrs. Finneran was concerned that Tiara might wander into an area of the golf course that had been freshly seeded or go out onto University Boulevard, a heavily traveled highway. She put on socks and ran to the basement to "put on some old mud shoes." By the time she came out of the house Tiara "had run back to

* * * [their] house area." We shall let her describe what happened.

> "Q. What did you do to her? A. As I approached her she was breathing heavily and seemed quite excited. I didn't feel like I should just grab the halter, so I talked to her a minute and I stroked her nose and I pulled some grass that she ate from my hand and when she seemed to accept me a little bit, I took hold of her halter and was leading her back to the area of the fence where she had broken through."
>
> * * *
>
> "Q. Would you describe what occurred from the moment you started leading the horse up along side of the fence until the accident occurred? A. Well, I had hold of her halter and I lead her from our—the area right next to our house and I was walking so that Tiara was between myself and the fence, because she is a very large horse. Like this — and just as we reached the area that was the broken part of the fence where I was going to lead her back in there, Cashew suddenly came right through that area, right towards Tiara and of course, the next few seconds as to what happened is difficult to describe. But Tiara, rather violently pulled at an angle, she was moving toward and also to the right. And naturally I dropped the halter because I couldn't hold her and I was off balance, I couldn't go side ways to get out of her way, she was moving in a left to right direction and the horse was coming. So the only thing I could do in an off balance fashion, I tried to spin around and get away from them, I remember turning loose and turned to my right and as I finished my turn, it was just an instant I saw Cashew here and Tiara kicked and that is the last I remember for a few seconds or few moments."

Mrs. Finneran went on to say that she and Tiara "were right at the break [in the fence] when Cashew came through that fence." She made it quite clear that "Tiara was kicking at Cashew" and not at her. Finneran saw the accident and his de-

scription of what happened is not materially different from his wife's. Wood testified that Finneran told him "it wasn't the horse's fault * * * one horse kicked at the other and Mrs. Finneran happened to be in the way" and that "it was one of those freak accidents that happen occasionally."

We have made a careful search of the record for evidence touching on Tiara's kicking propensities and Wood's knowledge thereof. We shall discuss our findings. Finneran testified that when he told Wood his wife had been kicked Wood said:

> "I know Tiara will kick * * * *at other horses* and did kick at Janie *in the* stables and it was a good lesson to her to be careful." (Emphasis supplied.)

Wood testified his girls rode Tiara bareback "with nothing but a halter," and, that she never "showed any disposition around humans that would constitute a hazard other than stepping on * * * [one's] foot." He imagined "the girls' feet" had been stepped on "a couple of times when they were in the stall" with her. He said "she did not kick in her stall nor did she have any tendency to be destructive as far as property is concerned."

Mary Christine Wood, aged 18, said "Tiara would sometimes kick at other horses * * * if she was romping in the field." There had been times, she said, when Tiara would push her against the fence but, she added, "she [Tiara] was being playful." She "would push her [Tiara] back and that's about it."

Elva Jean Smith, produced on behalf of the Finnerans, confessed to a love of horses and much experience in training and riding them. She testified that on one occasion, when Tiara was in the box stall, she reached in to pet her and that Tiara "threw back her ears [and] didn't particularly want to be touched." She did not elaborate.

Byron Stoskopf and Jerry Conner, both produced by the Finnerans, recalled that once or twice before the accident the horses were out of the corral. That seems to have been the extent of their knowledge of the matter.

The principle of law which we think is controlling here was stated, simply and succinctly, by Judge (now C. J.) Hammond, for the Court, in *Herbert v. Ziegler,* 216 Md. 212, 216, 139 A. 2d 699 (1958). He said:

"To hold liable the owner of a domestic animal that has caused injury, the claimant must show that the owner knew, or by the exercise of ordinary and reasonable care should have known, of the inclination or propensity of the animal to do the particular mischief that was the cause of the harm. *Twigg v. Ryland*, 62 Md. 380, 386 [1884]; and *May Co. v. Drury* [160 Md. 143, 153 Atl. 61 (1931)], *Evans v. Upmier* [16 N.W. 2d 6 (Ia. 1944)] and *Lynch v. Richardson* [39 N. E. 801 (Mass. 1895)], all *supra; Prosser, Torts* (2d ed.), Sec. 57, pp. 323-325; *Restatement, Torts,* Sec. 518."

To the same effect see *Hamilton v. Smith,* 242 Md. 599, 219 A. 2d 783 (1966).

It scarcely needs saying that there is no evidence in this record to suggest, much less prove, that Tiara ever kicked or kicked at a human being outside of her stall. That horses are not especially intelligent, that they are easily startled or frightened, that their principal means of defense is to kick, although not now widely known, have for centuries been among the simple facts of life. So it is that people who approach horses from the rear, especially if the horse is in a stall, without first making their presence known to the horse, are very apt to be kicked at upon entering the stall. Apparently it was in these circumstances that Tiara kicked at Janie, giving rise to her father's observation that "it was a good lesson to her to be careful." That Tiara may have stepped on "the girls' feet" is without significance. Whoever saddles, bridles or grooms a horse often enough, sooner or later, will have his foot stepped on. That Tiara "would sometimes kick at other horses" seems to us to have little significance here. Whether mares are unaware of the melancholy plight of geldings is a matter beyond our ken but that mares sometimes will kick at frisky male horses, whether gelded or not, is fairly common knowledge. One expects them to do that but one does not expect them to kick at humans while being led by a halter in an open field. Absent any evidence of such a propensity the question of scienter does not arise.

The Finnerans seem to suggest that Wood somehow or other was responsible for the fact that Tiara broke out of the corral. They cite two earlier occasions when the horses had to be rounded up and brought back. Since that is all of the evidence on that point we can only suggest it is at least as likely that a gate had been left open by some person other than Wood or his children. It is entirely clear, however, that neither Wood nor his children can be charged with any fault in connection with Tiara's escape on the occasion under consideration. They could hardly be required to anticipate that Tiara, having decided the grass on the other side of the fence was greener, would reach out for it with enough determination to dislodge the top rail. Furthermore they could scarcely have guessed that the fence was so inadequate.

The refusal of the trial judge to submit to the jury an issue sounding in trespass q.c.f. which the Finnerans insist was raised in the pleadings is assigned as error. We think it suffices to point out that Tiara was on the Finnerans' property with their knowledge and consent and that there is no evidence upon which could be predicated any duty on the part of Wood to maintain the corral fence. The contention lacks merit. *Baker v. Howard County Hunt,* 171 Md. 159, 188 Atl. 223 (1936) and *Annapolis and Elkridge R. R. Co. v. Baldwin,* 60 Md. 88 (1883).

Since, in our judgment, there is not sufficient evidence in the record to support a finding of primary negligence there is no need for us to consider Wood's contentions in respect of contributory negligence and assumption of the risk.

> *Judgment affirmed.*
> *Costs to be paid by the appellants.*