FERTSCH,
*Respondent,*

*v.*

HALL et al,
*Appellants.*

(35349; CA A35047)

715 P2d 502

William M. Holmes, Bend, argued the cause for appellants. With him on the brief was Gray Fancher Holmes & Hurley, Bend.

Paul Speck, Bend, argued the cause for respondent. On the brief were Leonard C. Parker, and Forcum, Parker & Speck, Bend.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

## ROSSMAN, J.

This is the "Case of the Cinchy Horse." Defendants were contacted by Robbins and were asked if they would be interested in exchanging their pickup truck for a bulldogging horse owned by Robbins. Plaintiff, an experienced rider, agreed to try out the horse for defendants. Robbins brought the horse to defendants' property. As plaintiff rode the horse, it bucked and threw him to the ground, causing serious injuries to his leg. Plaintiff brought this negligence action. The jury returned a verdict in his favor. Defendants appeal and we affirm.

Defendants assign as error the denial by the trial court of their motions for directed verdict made after plaintiff's case-in-chief and again at the close of all of the evidence. They contend that there was no evidence from which the jury could have found that they had any knowledge of the dangerous propensities of the horse to buck while being ridden for bulldogging purposes.

In *Westberry v. Blackwell,* 282 Or 129, 133, 577 P2d 75 (1978), Oregon adopted the rule of Restatement (Second) Torts § 518 (1976):

"Except for animal trespass, one who possesses or harbors a domestic animal that he does not know or have reason to know to be abnormally dangerous, is subject to liability for harm done by the animal if, but only if,

"(a)  he intentionally causes the animal to do the harm, or

"(b)  he is negligent in failing to prevent the harm."

Plaintiff alleged that defendants were negligent in failing to warn him that the horse was "cinchy." Defendants argue:

"Defendants and the horse owner Robbins had no knowledge that the horse had any propensity or characteristic that would cause it to buck when a rider shifted his weight in the saddle to bulldog a steer. Defendants and Robbins had no knowledge of the definition of the term cinchy as used by plaintiff in describing a bulldogging horse."

As we stated in *Kathren v. Olenik,* 46 Or App 713, 717, 613 P2d 69 (1980):

"The question is whether in the particular case the owner saw or heard enough to put a person of ordinary prudence on

notice that his animal may have a propensity toward the behavior which would result in the type of injury inflicted. Stated differently, would what was known by the owner have caused a reasonable person to anticipate the kind of behavior which resulted in the injury which occurred?"

When the evidence of a defendant's knowledge is in conflict, the question is one for the jury. *Westberry v. Blackwell, supra,* 282 Or at 133; *Butler v. Pantekoek,* 231 Or 563, 568, 373 P2d 614 (1962).

We hold that the evidence in this case did present a jury question. Accordingly, we also hold that the court did not err in denying defendants' motions for directed verdict. Plaintiff testified that "cinchy" has a unique meaning with bulldogging horses. When weight is shifted in the saddle, the horse will buck, rear up and may fall over backwards. Plaintiff testified that, if one knows a bulldogging horse is "cinchy," one doesn't get on it and that he was not told that the horse was "cinchy."

Robbins testified that he had owned the horse for only about six months and had had no difficulty with it. Robbins did not remember telling Tom Hall that the horse was "cinchy" but testified that, to him, the term meant a horse bucking or falling sideways when it was being saddled.

Tom Hall testified that Robbins had told him that the horse was "cinchy." When asked what this term meant to him, he stated:

"A. Well, at that point in time, it meant we have a horse right there at home. When we saddle him up, we first put a saddle on him, he'll kind of stand there and shake his head. We never cinch him very tight the first time. Set the saddle on real firm, go turn him around a time or two, * * * in little intervals, to where he kind of settles himself in. That particular horse is fine, after we go through that process.

"I'm sure if I just jerked him up really tight at first, he'd fall back on lead rope or do something that wouldn't be normal. At that point in time, most cinchiness when you first saddled them to me.

"Q. Okay. At that time, did you mean anything—Okay. Let me rephrase that. Do different horses, in your experience, portray different characteristics when they are cinchy?

"* * * * *

"A.   Yes. Different horses do react in different ways.

"Q.   How could that manifest itself based on your experience?

"A.   Oh, a lot of it is — I personally have never owned a horse that would do this after you saddle them, but I do understand that there's [*sic*] horses that — maybe some of these ranch horses. You'll hear these fellas tell stories about riding a horse all day and come in late in the evening and step off the horse, and just shifting the weight will cause them to drop their head and buck them off. There's a lot of different meanings of cinchiness. I've got — in the last couple of years, I have got a lot more indication of it.

"Q.   At that time did you know that there was more like one horse that dropped its head.

"A.   I probably did but I didn't think a lot of it. The type of events that I've worked in rodeos, I never had to dismount a horse. I mean team — well, calf roping you would. But it's a little different deal. Most of my experience with horses in the last few years has been team roping, where you don't dismount a horse in your event."

What defendants are apparently arguing is that the term "cinchy," to them, did not cover the reaction of the horse in bucking if the rider's weight were to shift when he tried to bulldog a steer. We disagree with the argument. From the evidence the jury could have found that, although defendants may not have been aware of the term as used in bulldogging, they knew that "cinchy" meant that a horse could react in a dangerous way in situations other than when it was being saddled. The jury could have found that defendants knew that this horse was cinchy and failed to warn plaintiff.

Affirmed.