778 P.2d 1261

Carole Ann **DOLEZAL**, a single woman; Edward Dolezal and Lydia Dolezal, husband and wife, Plaintiffs–Appellants,

v.

Frank C. **CARBREY** and Lynn Carbrey, husband and wife; Forrest Holden and Jane Doe Holden, husband and wife, dba Cactus Equestrian Stables, an Arizona corporation or partnership, Defendants–Appellees.

Nos. 1 CA–CIV 9851, 1 CA–CIV 9934.

Court of Appeals of Arizona, Division 1, Department D.

April 18, 1989.

Review Denied Sept. 19, 1989.

Van O'Steen and Partners by Steven J. Kuehl and W. Marc Ducker, Phoenix, for plaintiffs-appellants.

Jennings, Strouss & Salmon by William T. Birmingham, M. Byron Lewis and Michael J. O'Connor, Phoenix, for defendants-appellees Holden.

Robbins & Green, P.A. by Michael J. O'Grady, Phoenix, for defendants-appellees Carbrey.

## OPINION

CORCORAN, Judge.

Plaintiffs appeal from summary judgment in favor of defendants on a negligence claim, arguing that they presented a *prima facie* case of negligence to the trial court and that summary judgment was improper. We agree.

### Facts

On appeal from summary judgment, we view the facts and all inferences therefrom in the light most favorable to appellants. *State ex rel. Corbin v. Challenge, Inc.*, 151 Ariz. 20, 24, 725 P.2d 727, 731 (App.1986). Appellee Frank Carbrey owned two horses, which were boarded and stabled at appellee Forrest Holden's Cactus Equestrian Sta-

bles. One of the horses was a quarterhorse, nicknamed "Blue," which was ridden primarily by professional trainers and Carbrey's 11–year–old daughter, Allison. A "show horse" that had been trained to respond to subtle cues from its rider, Blue had won approximately 90 ribbons prior to the incident in question.

In December 1985, appellant Carole Dolezal was visiting her parents for the holidays. Carbrey, their neighbor, invited Carole to visit the stables and go horseback riding. Carole accepted the invitation and accompanied the Carbrey family to the stables on December 22, 1985. Carole told Carbrey that her riding experience was very limited and that she was a novice. Before that occasion, she had ridden a horse only two or three times and had never received formal riding instructions. Carbrey gave Carole some verbal instructions on how to ride, but did not tell her how to mount, sit, use the reins, turn, stop, or dismount. Expert testimony indicated that Carbrey's few verbal riding instructions to Carole were "like telling someone how to drive a car, sitting in the living room telling them ... and then giving them the keys.... An expert also testified that Carole did not know enough about riding horses to know what questions to ask Carbrey concerning properly mounting, riding and dismounting a horse.

Carole rode Blue in the riding arena at the stables. Allison was in the center of the arena observing Carole during the entire ride. At one point, Allison saw Carole flapping her legs against Blue's side and instructed her not to do so. Carbrey was also in the arena riding another horse. A gate was open at one end of the arena, contrary to written instructions posted on the gate that it was to be closed at all times.

After riding for approximately 25 minutes, Carole brought Blue up to Allison and attempted to dismount while Allison held the reins. As she was dismounting, Carole apparently dragged her right foot along Blue's rump and jabbed her left foot into Blue's side. Blue took a step or two forward and suddenly bolted. He ran through the open gate, up a small incline and under a metal roof extending along the front of a line of outdoor stalls. By this time, Carole had regained her seat on Blue; as Blue ran beneath the metal overhang, Carole hit her head on a post or beam. She was immediately thrown to the ground, suffering severe permanent injuries.

Carole and her parents sued Carbrey and Holden, alleging that Carbrey negligently allowed Carole to ride Blue, that he failed to properly instruct or supervise her, and that he failed to warn her about the open gate. They also alleged that Holden negligently failed to keep the gate closed, and that he failed to warn Carole of the low overhang.

Both Holden and an expert witness testified that Carole should not have been allowed to ride Blue. Another expert testified that the cause of the accident was Carbrey's lack of instructions to, and lack of supervision of, Carole, and the failure to keep the arena gate closed.

No one could testify with certainty why Blue bolted. One expert testified that "any opinion as to what caused the horse to spook in this particular instance would be nothing short of speculation," but that Carole's improper dismount may have been the cause and that proper dismounting technique "should have been explained to her." One of Blue's trainers testified that Blue could have understood Carole's improper dismount (i.e., dragging her foot across Blue's rump) as a cue to start walking. Carbrey himself testified that Blue may have been frustrated by Carole's improper riding and dismount. Carbrey admitted failing to warn Carole not to drag her heel as she dismounted.

Carbrey moved for summary judgment, claiming that he owed no duty to Carole, and that the accident was unforeseeable in light of Blue's previously gentle nature. The trial court granted the motion without explanation. Holden then moved for summary judgment on similar grounds, and the trial court granted his motion as well, again without explanation. The Dolezals filed timely notices of appeal from both

judgments, and the appeals were consolidated.

A negligence claim requires the plaintiff to prove (1) the existence of a legal duty obligating the defendant to adhere to a certain standard of conduct to protect others from unreasonable risks, (2) a breach of that duty, (3) a causal connection between the breach and injury, and (4) actual injuries or damages. *Ontiveros v. Borak*, 136 Ariz. 500, 504, 667 P.2d 200, 204 (1983), citing W. Prosser, *Law of Torts* § 30, at 143 (4th ed. 1971). The question whether a defendant owes a duty is one of law to be decided by the court. *Markowitz v. Arizona Parks Bd.*, 146 Ariz. 352, 354, 706 P.2d 364, 366 (1985). Although summary judgment is not usually granted in negligence cases, it is appropriate when no dispute exists as to any material facts, only one inference can be drawn from those facts and, based upon those facts, the moving party is entitled to judgment as a matter of law. *Nicoletti v. Westcor, Inc.*, 131 Ariz. 140, 142, 639 P.2d 330, 332 (1982).

Because we are presented with questions concerning the liability of two defendants, we address each defendant separately.

### Frank Carbrey

Carbrey argues that he either owed no duty, or if he did, he did not breach it as a matter of law. He contends that his conduct was reasonable, and that Blue's actions and Carole's resulting accident were unforeseeable. He relies on testimony that Blue was gentle, predictable, and had never before suddenly bolted. The Dolezals argue that Carbrey owed a duty to Carole, and that reasonable minds could differ on whether the accident was foreseeable; therefore, a jury should be allowed to decide whether Carbrey was negligent.

The most logical approach to analyzing questions involving negligence is to begin with the first element: duty, which is decided by the court. *Markowitz*, 146 Ariz. at 356, 706 P.2d at 368. In discussing duty, the supreme court stated:

> The question is whether the relationship of the parties was such that the defendant was under an obligation to use some care to avoid or prevent injury to the plaintiff. If the answer is no, the defendant is not liable even though he may have acted negligently in light of the foreseeable risks.

146 Ariz. at 356, 706 P.2d at 368. The supreme court has noted the confusion surrounding the concept of duty and the standard of conduct. *See Markowitz; Coburn v. City of Tucson*, 143 Ariz. 50, 691 P.2d 1078 (1984); *Beach v. City of Phoenix*, 136 Ariz. 601, 667 P.2d 1316 (1983). The following language from Prosser, cited in *Coburn*, is helpful:

> [T]he problems of "duty" are sufficiently complex without subdividing it ... to cover an endless series of details of conduct. It is better to reserve "duty" for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other, and to deal with particular conduct in terms of a legal standard of what is required to meet the obligation. In other words, "duty" is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty [if it exists] is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty....

143 Ariz. at 52, 691 P.2d at 1080, quoting W. Prosser & W. Keeton, *Law of Torts* § 53, at 356 (5th ed. 1984). The *Coburn* court then stated:

> Thus, the duty remains constant, while the conduct necessary to fulfill it varies with the circumstances. *Beach v. City of Phoenix, supra.* We see no benefit and considerable danger in attempting to analyze cases such as this in terms of whether the city did or did not have a duty to post stop signs, erect traffic control lights, remove bushes or give warning.

143 Ariz. at 52, 691 P.2d at 1080. The question here is whether Carbrey was under any obligation for the benefit of the plaintiff, Carole, and not whether Carbrey

had a specific duty to ascertain her level of riding ability, teach her how to dismount, or supervise her riding or dismount. Carbrey's attempt to break down the sequence of events that ultimately resulted in Carole's injuries, in terms of whether he owed a duty at each stage in time, or whether his conduct met that duty, confuses duty and conduct. *See Markowitz.*

■ Arizona follows the *Restatement of Torts* § 518 (1938) (old § 518) in determining a person's liability for harm caused by a domestic animal within that person's control. *See Vigue v. Noyes,* 113 Ariz. 237, 550 P.2d 234 (1976). That section states in part:

> [O]ne who possesses or harbors a domestic animal, which he does not have reason to know to be abnormally dangerous but which is likely to do harm unless controlled, is subject to liability for harm done by such animal if, but only if,
>
> (a) he fails to exercise reasonable care to confine or otherwise control it, and
>
> (b) the harm is of a sort which it is normal for animals of its class to do.

In applying this section, Arizona courts have required the owner or keeper of the animal "to know the normal habits and tendencies of animals of its class, realizing that even ordinarily gentle animals are likely to be dangerous under particular circumstances." *Vigue,* 113 Ariz. at 240, 550 P.2d at 237; *Safford Animal Hosp. v. Blain,* 119 Ariz. 296, 298, 580 P.2d 757, 759 (App. 1978). Thus, Carbrey had a duty to exercise reasonable care to prevent such harm from occurring to Carole as could normally result from her riding Blue. Carbrey argues, however, that it was unforeseeable that Blue, a previously gentle, predictable horse, would unexpectedly bolt and cause Carole's resulting injuries.

Confusion exists on how foreseeability fits into a negligence claim analysis. The supreme court in *Markowitz* did not directly address foreseeability because it was not at issue, other than to point out that "[t]he test for whether conduct is negligent is whether there is a foreseeable risk of injury from the conduct." 146 Ariz. at 357,

706 P.2d at 369. This court, however, has stated:

> [T]hree aspects of foreseeability have developed in Arizona law: first, the determination by the court as a matter of law whether as a part of duty, the injury to the Plaintiff was foreseeable under the circumstances; second, ... where the Supreme Court held that foreseeability was a proper question for the jury on the issue of negligence; and third, where the court views foreseeability as an element of proximate or legal causation in intervening force—superseding cause situations.... There seems to be a conflict in these three positions.

*City of Scottsdale v. Kokaska,* 17 Ariz. App. 120, 125, 495 P.2d 1327, 1332 (1972).

Elaborating on how foreseeability fits into the "duty" analysis, we have stated:

> In the first instance, the determination of whether the defendant owed to plaintiff any duty to use due care at all is always a question of law for the court.... This issue is to be presented to the jury, however, where there is a debatable question as to whether the injury to the plaintiff was within the foreseeable scope of the risk and whether the defendant was required to recognize the risk and take precautions against it.

*Schnyder v. Empire Metals, Inc.,* 136 Ariz. 428, 431, 666 P.2d 528, 531 (App.1983); *accord, Griffith v. Valley of the Sun Recovery & Adjustment Bureau,* 126 Ariz. 227, 230, 613 P.2d 1283, 1286 (App.1980).

In *Vigue,* the owner of a horse named Whiskey let it run loose in an arena where other owners were typically present feeding, exercising, and cleaning their horses. Whiskey unexpectedly kicked a 4–year–old girl who was in the arena with her mother. Applying old § 518 to the facts of the case, the court concluded that sufficient evidence existed for the jury to find that the owner had failed to exercise reasonable control over Whiskey. It also concluded, however, that the plaintiff had failed to show that the harm that occurred—the little girl being kicked—was of a sort that is normal for horses to do, and that no evidence existed from which reasonable men could infer

that "a horse such as Whiskey would normally become vicious in these circumstances toward other horses, young children or persons carrying feed." *Vigue,* 113 Ariz. at 240–41, 550 P.2d at 237–38.

■ We interpret the second requirement of old § 518 as the foreseeability element in a negligence claim. Was it normal or foreseeable that a horse such as Blue might unexpectedly bolt? Assuming Blue was a show horse trained to respond to subtle cues, as we must in light of the conflicting evidence when reviewing summary judgment, undisputed testimony indicated that Carole's legs were flapping during her ride and that she jabbed the horse with one foot and dragged her heel across the horse's back when she attempted to dismount. Although no one has testified with certainty on what caused Blue to bolt, we can infer that he bolted in response to Carole's improper riding technique and dismount. Reasonable minds could differ whether it is foreseeable that an otherwise gentle horse might bolt in reaction to out-of-the-ordinary cues. Taking this one step further, we also believe that reasonable minds could conclude that it is foreseeable that an inexperienced rider on a runaway horse could be harmed in some manner.

Section 518 has been amended. *Restatement (Second) of Torts* § 518 (1976) (new § 518) now provides:

Except for animal trespass [§§ 504 and 505], one who possesses or harbors a domestic animal [§ 506] that he does not know or have reason to know to be abnormally dangerous [§ 509], is subject to liability for harm done by the animal if, but only if,

(a) he intentionally causes the animal to do the harm, or

(b) he is negligent in failing to prevent the harm.

The Reporter's Note to new § 518 merely states: "This Section has been changed by broadening it to include all liability for intent or negligence." On its face, new § 518 eliminates the requirement that the harm done be such that is normal for animals of the same class to do, and is therefore more favorable to the plaintiff than

was old § 518. However, neither party argues that we should apply new § 518 to the case before us; thus, we decline to decide whether new § 518 should be the law in Arizona. We note, however, that our decision in this case would be the same under new § 518 as it is under old § 518.

In dissent, Judge Grant argues that "[i]t is only the theoretical horses of the experts that adduce any showing of dangerousness," and that she is "not persuaded by the experts' testimony" regarding Blue's training. Were we the trier of fact, we might agree. However, as we stated earlier, on review of this summary judgment we must view the facts and all inferences therefrom in the light most favorable to the appellants.

■ We also note that Judge Grant cites *Schleier v. Alter,* 159 Ariz. 397, 767 P.2d 1187 (App.1989), for the standard used in determining liability for injury by domestic animals. However, the standard used in *Schleier* (though not cited in the opinion) is *Restatement (Second) of Torts* § 509, "Harm Done by Abnormally Dangerous Domestic Animals." The Dolezals do not argue that Blue is an *abnormally dangerous* animal; the proper standard is old § 518, "Liability for Harm Done by Domestic Animals Which Are *Not* Abnormally Dangerous." (Emphasis added.) Carbrey's lack of "knowledge of any special danger about which he should have warned Carole" does not relieve him of the duty to exercise reasonable care to control Blue. We cannot say, as a matter of law, that Carbrey fulfilled his duty.

In summary, Carbrey had a duty to exercise reasonable care to protect Carole from unreasonable risk of harm while she was riding Blue. In light of the conflicting evidence, questions whether Carbrey fulfilled his duty must be resolved by the trier of fact. This depends entirely on his conduct. It then becomes appropriate to consider such questions as whether, under the circumstances, Carbrey should have let an inexperienced rider such as Carole ride Blue, whether he sufficiently instructed her, and whether he sufficiently supervised her ride and dismount. Because these are

fact questions with conflicting evidence, they must be resolved by the trier of fact. We simply cannot say as a matter of law that Carbrey's conduct was reasonable, in light of the foreseeable risk and conflicting evidence. The summary judgment in Carbrey's favor therefore must be reversed.

### · Forrest Holden

■ Any liability of Holden stems from his ownership of the premises on which Carole was injured. *Restatement (Second) of Torts* § 360 (1965) provides:

### § 360. Parts of Land Retained in Lessor's Control Which Lessee is Entitled to Use

A possessor of land who leases a part thereof and retains in his own control any other part which the lessee is entitled to use as appurtenant to the part leased to him, is subject to liability to his lessee and others lawfully upon the land with the consent of the lessee or a sublessee for physical harm caused by a dangerous condition upon that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care could have discovered the condition and the unreasonable risk involved therein and could have made the condition safe.

Section 360 has been followed in Arizona. *See Forbes v. Romo*, 123 Ariz. 548, 550, 601 P.2d 311, 313 (App.1979). Section 360 is applicable here because Holden leased the stalls in which Carbrey boarded his horses, and retained control over the riding arena and other portions of the facility provided for the common use of patrons of the facility.

■ Holden contends that, to establish his liability, Carole must show that he *knew* of the dangerous condition. Section 360, however, imposes liability if the lessor, exercising reasonable care, "*could have* discovered" the condition posing an unreasonable risk of harm. We cannot say as a matter of law that Holden could *not* have discovered the potentially dangerous conditions on the premises; thus, the issue is one for the finder of fact.

■ The parties disagree whether Carole was an invitee or a licensee. Under general Arizona law, a landowner's duties and liabilities depend upon the status of the plaintiff. *Shannon v. Butler Homes, Inc.*, 102 Ariz. 312, 428 P.2d 990 (1967); *Robles v. Severyn*, 19 Ariz.App. 61, 63, 504 P.2d 1284, 1286 (1973). However, under § 360, a plaintiff's status is irrelevant. Comment c provides:

A lessor may be liable to an invitee or even to a licensee of the lessee, although neither he nor the lessee would be liable under the same circumstances to their own invitees or licensees. The privilege of the visitor is not based ... upon the consent given upon the occasion of the particular visit, but upon the fact that he is entitled to enter by the right of the lessee, who is entitled under his lease to use the part of the land within the control of the lessor not only for himself, but also for the purpose of receiving any persons whom he chooses to admit.... It follows that the lessor's duty is not always satisfied by warning the lessee or others of the dangerous condition, and that the knowledge of such persons of the danger will not always prevent their recovery.

■ Holden admits that he retained control over the riding arena, and he presented no evidence that boarders at the stable were prohibited from bringing guests to the arena. Thus, § 360 imposed a duty on Holden to exercise reasonable care to discover conditions that posed an unreasonable risk of harm to Carole and to make such conditions safe. Whether Holden breached that duty is a genuine issue of material fact. Although the stables' policy was that riding was permitted only in the arena area, reasonable minds could differ whether it was foreseeable that someone would ride a horse near the roof overhanging the outside stalls, either intentionally or as a result of a runaway horse, as in this case.

Holden presented no evidence that he could not have discovered the dangerous condition posed by the low roof and the gate. At the very least, the facts support

an inference that Holden was aware of the risk of leaving the gate open and so posted the sign on it. Questions whether the sign on the gate fulfilled Holden's duty, or whether he should have installed self-closing gates or warned Carole about the metal overhang all pertain to conduct, and are questions for the finder of fact. Absent evidence that these conditions could not have been made safe, summary judgment was improper.

■ Finally, we do not believe that A.R.S. § 33-1551, referred to in the dissent, has any application to this case. As the dissent notes, that section absolves a "premises" owner of liability for injuries caused by a "recreational user." First, we do not believe that Holden's stables fit within the intended meaning of "premises." Second, we believe that Carbrey's boarding fees constitute an "admission fee," and thus Carbrey and Carole would not be "recreational users."

## Conclusion

Both summary judgments are reversed and this matter is remanded for trial.

GREER, J., concurs.

GRANT, Chief Judge, Dissenting:

I respectfully dissent because I would affirm the order of the trial court granting both defendants' motions for summary judgment.

I differ with the majority's interpretation of the law and facts in this case. The fundamental issue is one of the foreseeability of the injury. From the deposition testimony, it is quite clear that no one anticipated or could have anticipated that Blue would bolt under these circumstances. Both of Blue's trainers, Brian Whaler and Mark Sheridan, testified that the horse was gentle and predictable, and that they regarded Blue as the last horse that would behave in this way. One of the expert witnesses, Donald Brannan, admitted that the horse's trainers would be more familiar with the horse than anybody else. The gentle disposition of Blue prior to this incident is uncontested.

It is only the theoretical horses of the experts that adduce any showing of dangerousness. I am not persuaded by the experts' testimony regarding the training of a "show horse." The testimony is uncontroverted that this horse was trained as a western pleasure horse and that the 90 awards Blue received were in the western pleasure horse category. Furthermore, the trainers and one of the experts agree that a professionally trained horse, seasoned by the experience of show competition, is a more well-behaved and predictable horse. In light of that, the theory that Carole's movements may have confused a horse trained to respond to subtle cues is unpersuasive and entirely speculative.

Nevertheless, the majority apparently relies upon the experts' theoretical testimony to a greater extent than that of the trainers, and finds there to be conflicting testimony warranting reversal. The experts' testimony should be given no greater weight than that of other witnesses; on questions of law and fact the trial court is not bound by the experts' testimony. *Cook v. Great Western Bank*, 141 Ariz. 80, 87–88, 685 P.2d 145, 152–53 (App.1984).

The majority states that Arizona courts have required the owner of the animal "to know the normal habits and tendencies of animals of its class, realizing that even ordinarily gentle animals are likely to be dangerous under particular circumstances." *See supra* 1265, citing *Vigue v. Noyes*, 113 Ariz. 237, 240, 550 P.2d 234, 237 (1976). In *Schleier v. Alter*, 159 Ariz. 397, 767 P.2d 1187 (Ct.App.1989), this court reiterated the basis for liability at common law for injury by domestic animals first set forth in *Jones v. Manhart*, 120 Ariz. 338, 340, 585 P.2d 1250, 1252 (App.1978):

A possessor of a domestic animal that he knows or has reason to know has dangerous propensities abnormal to its class, is subject to liability for harm done by the animal to another, although he has exercised the utmost care to prevent it from doing the harm.

Here there was no reason for Carbrey to know Blue had "dangerous propensities abnormal to its class" because in fact Blue

did not. The circumstances called into question here—a novice or inexperienced rider on a three-year-old horse—are no different from those in which this particular horse might have been found at any time prior to the incident. The horse had been used by trainers and riding instructors to teach novice and inexperienced people how to ride. Blue was frequently ridden by inexperienced riders of all ages without incident. Therefore, Carbrey had a duty of ordinary care toward Carole. The horse on which she rode had no history of dangerous behavior; thus Carbrey had no knowledge of any special danger about which he should have warned Carole or from which he had a duty to protect her.

Carbrey's knowledge of the normal behavior of Blue bears on the issue of foreseeability. Negligence necessarily involves a foreseeable risk, a threatened danger of injury, and conduct unreasonable in proportion to the danger. *Prosser & Keeton on Torts*, § 43 (5th ed. 1984).

> If one could not reasonably foresee any injury as the result of one's act, or if one's conduct was reasonable in light of what one *could anticipate* there would be no negligence, and no liability.

*Id.* (emphasis added).

Because Carbrey had no knowledge of any dangerous tendency of the horse, he could not have foreseen the injury to Carole. He had a duty of care toward her that I believe he met: he spoke to Carole of riding techniques. I also believe that having the reins held while Carole dismounted was a safety measure that met Carbrey's duty of care. One of Blue's trainers said that the practice of having someone on the ground holding the reins while a rider dismounts is done as an extra safety precaution. The trainer further stated that the training provided to Carbrey's daughter, Allison (who held the reins), would have enabled her to control the horse under ordinary circumstances. The injury Carole sustained was not foreseeable, and therefore, Carbrey should not be held liable as a matter of law.

Case law in Arizona and other jurisdictions supports this position. In *Vigue v. Noyes*, Section 518 of the *Restatement of Torts* was applied to a particular animal in specific circumstances. The *Vigue* court said, "No evidence was presented in the instant case ... from which reasonable men might infer that a horse *such as Whiskey* would normally become vicious in *these circumstances* ...," *Vigue*, 113 Ariz. at 240, 550 P.2d at 238. Comment e to Section 518 of the *Restatement of Torts* states that the "care which the keeper of a domestic animal is required to exercise ... is commensurate with the character of the animal." The language of Section 518 that refers to "class of animal" has been narrowly construed in Arizona, in keeping with comment e of the *Restatement*, to mean a particular horse ("such as Whiskey") and particular circumstances. *Vigue v. Noyes*. This treatment is consistent with the application of Section 518 in other jurisdictions and also with the manner in which other jurisdictions handle negligence cases involving horse-related injuries.

In *Fertsch v. Hall*, 78 Or.App. 232, 715 P.2d 502 (1986), a case in which Section 518 was applied, the facts showed that the defendants knew this particular horse was "cinchy" (sensitive to the bellystrap of a saddle). Because the extent of the defendant's knowledge was in conflict, the court said the question was one for the jury.

> From the evidence the jury could have found that, although defendants may not have been aware of the term as used in bulldogging, they knew that "cinchy" meant that a horse could react in a dangerous way in situations other than when it was being saddled. The jury could have found that defendants knew that this horse was cinchy and failed to warn plaintiff.

*Fertsch*, 78 Or.App. at 236, 715 P.2d at 504.

In *Fertsch*, Section 518 is applied with regard to the character of a particular horse and to the circumstances of the horse's use. The evidence showed that the defendant knew the character of the horse and could have foreseen an injury occurring were the horse being used under usual circumstances. That is, defendants knew the horse would have become "cinchy"

while being saddled and could have foreseen an injury in that circumstance. Under a replication of the known circumstances, duty or the breach thereof could be decided by the court as a matter of law.

It is the changed circumstances in *Fertsch*, however, which caused the question to be put to the jury. Because the injury occurred while the horse was being used in bulldogging, a question arose whether defendants knew the cinchy horse would exhibit its characteristic behavior under these circumstances.

No such changed or unusual circumstances exist in the present case. Novice riders frequently rode Blue and Blue had never bolted. Because Carbrey had no knowledge of any dangerous tendencies of the horse and because the circumstances of use were no different, Carbrey could not have foreseen the injury to Dolezal. There is, therefore, no question of fact that need be put to the jury, and the trial court properly found no breach of duty as a matter of law.

A similar conclusion was reached in *Finneran v. Wood*, 249 Md. 643, 241 A.2d 579 (1968), another case applying Section 518 of the *Restatement of Torts*. There a horse, which was known to be very tame and which had previously kicked only at other horses, kicked the plaintiff. It was admitted that the horse was trying to kick another horse and that plaintiff had been accidentally kicked. On appeal, the court said, however, there was no evidence that the defendant knew or should have known that the horse was likely to injure a human, and that judgment for the defendant was proper. *See also Mercer v. Fritts*, 9 Kan. App.2d 232, 676 P.2d 150, *aff'd*, 236 Kan. 73, 689 P.2d 774 (1984) (where owner rode mare near the stallion being ridden by a social guest, a question of fact regarding owner's knowledge of stallion arose as owner had never before ridden the mare near the stallion in these circumstances).

Section 518 of the Restatement has also been applied in dog bite cases. In *Kathren v. Olenik*, 46 Or.App. 713, 719, 613 P.2d 69, 73 (1980), the court said that no duty to control or confine the animal is imposed on the owner absent "knowledge or a basis for knowledge" that the animal will behave in a potentially injurious manner. The court said that the defendants were not charged with a general knowledge that dogs will bite human beings. *Kathren*, 46 Or.App. at 720, 613 P.2d at 73. *See also Arnold v. Laird*, 94 Wash.2d 867, 621 P.2d 138 (1980) (it is not per se unreasonable to keep a dog in a fenced backyard if the animal has not exhibited dangerous tendencies).

In other jurisdictions where negligence suits have been brought against horse owners, the owner's knowledge of the horse's character was determinative in finding a duty breached. In *Fortune v. Holmes*, 48 Tenn.App. 497, 348 S.W.2d 894 (1960), the court found that the jury was entitled to determine whether a riding instructor used reasonable and ordinary care in furnishing a novice rider with a *known tender-mouthed, spirited horse* equipped with a severe type of bit. Similarly, in *Deese v. White Belt Dairy Farms, Inc.*, 160 So.2d 543, 545 (Fla.App.1964), where evidence was presented that the *defendant knew* the horse was "a wild S.B.," the jury could determine whether the defendant exercised ordinary care toward the social guest rider. In *Heald v. Cox*, 480 S.W.2d 107 (Mo.App. 1972), the jury could find that *the owner knew* of the horse's *tendency to buck*, and that the owner had a duty to warn the social guests of the horse's character. In *Wolfe v. Wilkins*, 491 P.2d 595 (Colo.App. 1971), where the horse had *no history of vicious or dangerous behavior*, had been ridden without incident by teenage children of the owner, and the professional trainer of the horse classified this horse as a good horse, the owner was not liable for injuries sustained by the social guest who was bucked off by the horse. Also, in *Bradshaw v. Minter*, 206 Va. 450, 143 S.E.2d 827 (1965), where the owner knew of the horse's tendency to run, to be high spirited, to be nervous, and not good for an inexperienced rider the owner had a duty to warn the plaintiff/rider. For an extensive review of horse injury cases, see 6 A.L.R.4th 358 and 15 A.L.R.2d 1313, "Liability to Hirer or Bailee of Horse" and 85 A.L.R.2d 1161, "Injuries by Horses."

The defendant Carbrey did not breach the duty he owed to Carole. The order of the trial court should be affirmed.

For similar and additional reasons, I would affirm the summary judgment in favor of defendant Holden. Case law on the issue relating to Holden's liability (landlord's liability for injury by a horse to a guest or entrant onto land) indicates that in the absence of statute or decisional law establishing a standard of care for the operation of a stable, the duty Holden owed to entrants onto his land was that of ordinary and prudent care.

The majority relies upon Section 360 of the *Restatement (Second) of Torts* (1965) for the proposition that Holden " 'could have discovered' the condition posing an unreasonable risk of harm." *See supra* 14. I do not think that the conditions in question, the open gate and the roof beam, remained undiscovered by Holden. He had placed a sign on the gate which said the gate should be closed for safety reasons. Clearly the risk of an open gate had been "discovered" by Holden, and he had dealt with this risk by placing the sign on the gate. Similarly, the risk posed by the low beam in the stall was not an undiscovered risk, since horse riding was to be conducted exclusively in the arena.

The question is whether Holden had a duty to install a self-closing gate on the arena or to in some fashion make safe the low beam in the horse stall, as is suggested by the experts. I do not believe he had such a duty.

In *Clifton v. Holliday*, 85 Ohio App. 229, 88 N.E.2d 304 (1949), the court held that the stable owner was not liable for the head injury suffered by a rider as a result of hitting a low beam within the stable when the horse she was riding bolted and ran through an unbarred stable door. The court said that in the absence of a showing of a recognized standard of care requiring stables to be equipped with bars over the entrance to the stalls, judgment for the stable owner was proper. A similar result

was reached in *Durham v. Barnes*, 124 So.2d 792 (La.App.1960), wherein the operator of a stable was held not negligent, and in the absence of a showing that the horse was vicious, the security measures taken to enclose the horse in the stall were adequate.

In the case before us, there is no showing by plaintiff that there is a recognized standard of care with regard to the gates enclosing a riding arena or with regard to the height of beams in a horse stable. The experts testifying on behalf of the plaintiff could not, for example, cite one stable operator in Arizona who practices the experts' suggested safety measures. Also, one expert, Brannon, testified that the gates used at the training facilities were those normally used at training facilities like Holden's. Holden met the standard of care established by § 360 and the experts failed to establish a higher standard of care which Holden was obliged to meet under existing Arizona law. In *Groh v. Hasencamp*, 407 So.2d 949 (Fla.App.1981), the court found that in the absence of a duty expressed in statute or decisional law, there was no standard of care requiring a fence around a horse pasture to be electrically charged or if charged to be maintained at all times. "As there was no duty on [the defendant's] part to either install or maintain an electrical charge on the fence, failure to turn it on the day of the accident is not actionable." *Groh*, 407 So.2d at 952.

Here, there is no duty on Holden's part to install self-closing gates or to reconstruct his stables. He has exercised reasonable care in the safety measures already undertaken. There is no evidence in the record indicating a higher standard of care appropriate to the operation of riding facilities to which Holden should be held and for that reason summary judgment should be affirmed. "Negligence is never presumed. It must be proved, and it must be shown to be the proximate cause of a plaintiff's injuries." *Clifton v. Holliday*, 85 Ohio App. at 235, 88 N.E.2d at 307.[1]

1. Finally, I question any liability on the part of Holden for Carole's injuries given the language of A.R.S. § 33–1551. The statute says:

§ 33–1551. Duty of owner, lessee or occupant of premises to recreational users; liability; definitions

I would affirm the summary judgment granted to both defendants.

A. An owner, lessee or occupant of premises does not:

1. Owe any duty to a recreational user to keep the premises safe for such use.

2. Extend any assurance to a recreational user through the act of giving permission to enter the premises that the premises are safe for such entry or use.

3. Incur liability for any injury to persons or property caused by any act of a recreational user.

B. As used in this section:

1. "Premises" means agricultural, range, mining or forest lands, and any other similar lands which by agreement are made available to a recreational user, and any building or structure on such lands.

2. "Recreational user" means a person to whom permission has been granted or implied without the payment of an admission fee or other consideration to enter upon premises to hunt, fish, trap, camp, hike, ride, swim or engage in similar recreational pursuits. The purchase of a state hunting, trapping or fishing license is not the payment of an admission fee or other consideration as provided in this section.

C. This section does not limit the liability which otherwise exists for maintaining an attractive nuisance, or for wilful or malicious failure to guard or warn against a dangerous condition, use or activity.

Although this statute was not raised by the parties and this case can be decided on other grounds, I would note that Carole was clearly a recreational user of the premises since she paid no money to anyone for the opportunity to ride the horse.